UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    *Plaintiff,*

    *vs.*                                     Case No.  24-cr-6

JAMES MORGAN,

    *Defendant.*

## MOTION TO DISMISS

James Morgan, by counsel, moves to dismiss the indictment because 26 U.S.C. § 5861 is unconstitutional.

### I.    Section 5861 is an unconstitutional use of Congress's taxing power and the indictment must be dismissed.

The charges surrounding Morgan's possession of the grenades were brought under Title 26 of the U.S. Code—otherwise known as the tax code. And it centers on his failure to register the grenades and pay the tax, not the possession.[1] While the government has its own reasons for electing to charge Morgan under Title 26, the defense submits that the prohibition and penalties contained in § 5861 are beyond Congress's taxing power. Thus, Congress has acted unconstitutionally, and the indictment must be dismissed. To understand the defense's argument and grasp the problems with this statute, it's helpful to (briefly) sketch out the statute's history, how earlier challenges to

---

[1] *Haynes v. United States,* 390 U.S. 85, 93 (1968).

it differ from the defense's argument here, and why two recent Supreme Court decisions

both control the analysis and establish that § 5861 is an unconstitutional regulation.

### A. Congress used its taxing power to implement the National Firearm Act, and at the time it was a permissible use of that power—but that changed.

In the mid-thirties, Congress passed the National Firearm Act. Among other

things, it taxed the sale of machine guns. The tax was $200. At the time, Congress's power

under the Commerce Clause was not as expansive as its presently accepted form.[2] And

so, Congress used its taxing power to regulate machine guns—hence, Congress placing

the regulation in Title 26.

The tax was soon challenged as too burdensome and a pretext for Congress's

otherwise-prohibited desire to regulate certain firearms. In *Sonzinsky v. United States*, the

Supreme Court looked at the statute and began with the obvious:

> Every tax is in some measure regulatory. To some extent it interposes an
> economic impediment to the activity taxed as compared with others not
> taxed. But a tax is not any the less a tax because it has a regulatory effect,
> and it has long been established that an Act of Congress which on its face
> purports to be an exercise of the taxing power is not any the less so because
> the tax is burdensome or tends to restrict or suppress the thing taxed.[3]

The Court in *Sonzinsky* also noted that courts should not speculate about Congress's

hidden motives under the taxing authority—if it raises revenue then it's a tax, even if

Congress hopes to accomplish something more with it.[4]

---

[2] *Compare Nigro v. United States*, 276 U.S. 332, 353–54 (1928) (regulating narcotics under the taxing power), *with Raich v. Gonzalez*, 545 U.S. 1, 22 (2005) (regulating them under the commerce power).

[3] *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937) (citation omitted).

[4] *Id.* at 514.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC

In the case of the National Firearm Act, the Court reasoned that it produced revenue that was collected by the Internal Revenue Service and thus it operated as a tax: "As it is not attended by an offensive regulation, and since it operates as a tax, it is within the national taxing power."[5] With that decision, it stood beyond question that Congress was acting within its taxing power when it imposed a tax and attendant registration requirements on machine guns. If you want a machine gun, pay a $200 tax—end of discussion. And that was the way it was for almost fifty years.

Then, in 1986, Congress passed a new law: it provided that it was illegal to possess *any* machine gun manufactured after 1986.[6] That law was passed under Congress's Commerce Clause power, so to convict the government had to prove that it was a machine gun and that it involved interstate commerce.[7] Additionally, the Supreme Court's holding in *Lopez* changed the way courts looked at the interstate commerce element—before *Lopez*, it was little more than a formality; afterwards there had to be an actual nexus between the regulated item and interstate commerce.[8]

After Congress passed the ban in 1986, the ATF and the IRS refused to allow anyone to pay the firearm tax.[9] So to comply with the law and have a machine gun under § 5861, a person had to pay the $200 tax, but the transferor couldn't pay the tax—the ATF

---

[5] *Id*.

[6] *See* 18 U.S.C. § 922(*o*).

[7] *See United States v. Kenney*, 91 F.3d 884, 888 (7th Cir. 1996) (noting "if 922(*o*) is constitutional it must bear more than a generic relationship several steps removed from interstate commerce.").

[8] *Lopez*, 514 U.S. 549 (1995); *United States v. Morrison*, 529 U.S. 598, 608–17 (2000); *Jones v. United States*, 529 U.S. 848, 855–58 (2000) (finding federal arson needed more than that the materials moved in interstate commerce).

[9] *See* 27 C.F.R. § 179.105.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC

refused to collect that revenue and register the firearm. That scenario of obligation-and-impossibility spawned two legal challenges to § 5861. First, that the law was unconstitutional because it was impossible for a person to comply with it; and second, that Congress implicitly repealed § 5861 when it passed § 922(*o*).[10]

### i. The initial attacks made on § 5861 were focused on fundamental fairness and the idea that Congress implicitly repealed the statute.

The impossibility argument has some natural appeal. To convict someone for failing to do something that isn't even possible certainly violates notions of fundamental fairness—it's Kafkaesque. The Tenth Circuit seized on this reasoning when it held that § 5861 was unconstitutional.[11] Six appellate courts, however, disagreed and held that the statute could be complied with in one simple way: just don't possess a machine gun.[12]

The second argument was slightly different and a bit more technical. The basic premise was that § 5861 was a valid law—the Supreme Court had said so. But with § 922(*o*) Congress had implicitly repealed the law.[13] This is a difficult argument to succeed with: Congress is, after all, presumed to know how the laws interact and to pass them accordingly.[14] In addition, it is only in the rare case where the Court will find a statute

---

[10] *See United States v. Carmel*, 548 F.3d 571, 577–79 (7th Cir. 2008) (discussing both).

[11] *See United States v. Dalton*, 960 F.2d 121, 126 (10th Cir. 1992) ("As a result of section 922(*o*), compliance with section 5861 is impossible.").

[12] *See Carmel*, 548 F.3d at 579 (collecting cases).

[13] *See Dalton*, 960 F.2d at 126; *United States v. Rock Island Armory*, 773 F. Supp. 117, 126 (C.D. Ill. 1991); *United States v. Ardoin*, 19 F.3d 177, 172–84 (5th Cir. 1994) (Wiener, J., dissenting).

[14] *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 696–97 (1979) (noting "[i]t is always appropriate to assume that our elected representatives, like other citizens, know the law"); *United States v. LeCoe*, 936 F.2d 398, 403 (9th Cir. 1991) ("Congress is, of course, presumed to know existing law pertinent to any new legislation it enacts.").

repealed by implication.[15] There have to be certain indicia, and none of those were present when it came to the enactment of § 922(*o*). So courts reasoned that § 922(*o*) did not repeal § 5861. It's under those two bases that the statute in most circuits has been upheld.[16]

### B. The defense's argument relies upon recent case law that articulates the test for when a tax is actually a tax and not an impermissible regulation.

At the time that *Sozinsky* examined § 5861, it was a legitimate revenue raising measure, and so it constituted a valid exercise of Congress's taxing authority. But that has changed. It is now a pure prohibition of behavior that is traditionally reserved for the states, namely the regulation of firearms not in or affecting interstate commerce. It cannot, therefore, be justified as an expression of Congress's taxing (or commerce) authority.

This argument rests on different cases than those used by defendants to argue that § 922(*o*) silently overruled § 5861. *Dalton* was decided in 1992 and *Rock Island Armory* in 1991.[17] Rather, the cases that give the clearest understanding of what separates a permissible tax from an impermissible regulation are of a recent vintage.[18] Significantly, *Sebelius* breathed new life into precedent from a century ago when courts regularly invalidated laws passed under Congress's taxing power.[19] The decisions in *Sebelius* and *Kurth Ranch* set out the proper analysis for Courts to determine what is a "tax," (that is, a

---

[15] *See Morton v. Mancari*, 417 U.S. 535, 549–50 (1974) (noting "repeals by implication are not favored").

[16] *See Carmel*, 548 F.3d at 579.

[17] *See Dalton*, 960 F.2d at 126; *United States v. Rock Island Armory*, 773 F. Supp. 117, 126 (C.D. Ill. 1991).

[18] *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012); *Dep't of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 767 (1994).

[19] 567 U.S. at 536–38 (surveying cases).

permissible use of Congress's taxing power), and what is simply an impermissible regulation under the guise of a tax.[20]

### i. Congress's taxing power is not without limits—a tax must operate like a tax.

To understand the test that *Sebelius* and *Kurth Ranch* set out and why § 5861 fails that test, it's important to return to some first principles of constitutional law. One, Congress does not have unlimited power; its powers are enumerated and well-defined.[21] Significant among these is the power to tax and spend.[22] The taxing power gives Congress considerable influence in areas of life that it could not otherwise regulate directly—Congress "may enact a tax on an activity that it cannot authorize, forbid, or otherwise control."[23] That is, it can use the taxing power to encourage certain behavior (buying houses) and it can use it to discourage certain behavior (smoking). But the primary purpose and the attendant means of effecting that behavior (getting people to buy houses or stop smoking) has to be taxing—raising revenue or giving a tax break. Two, a tax is not just anything that the government calls a tax. Rather, a tax is a "charge imposed by the government on persons, entities, transactions, or property to yield public revenue."[24]

---

[20] *See Kurth Ranch*, 511 U.S. at 780 (noting "at some point, an exaction labeled as a tax approaches punishment, and our task is to determine whether Montana's drug tax crosses that line.").

[21] *Sebelius*, 567 U.S. at 530.

[22] *See* U.S. Const., Art. I, § 8, cl. 1.

[23] *Sebelius*, 567 U.S. at 537.

[24] Black's Law Dictionary 1685 (10th ed. 2014); *see also United States v. Mississippi Tax Comm'n*, 421 U.S. 599, 606 (1975).

So a legitimate tax will have behind it the purpose of raising revenue. And three, Congress can't simply label a regulation or penalty a tax, when it is anything but one.[25]

The issue then turns on how courts are supposed to determine where a challenged law stands—is it a legitimate tax as opposed to a prohibited regulation under the guise of a tax? The recent Supreme Court cases have provided guidance on this issue—criteria that were used in cases a century ago but were given force recently.[26] To that end, the Supreme Court has instructed courts to disregard "the designation of the exaction, and view[] its substance and application."[27] Focusing on the measure's practical operation and not simply the words Congress invoked, the Court in *Sebelius* looked back to the *Child Labor Tax Case* for three practical considerations that separate a tax from a penalty.[28]

There, the Supreme Court noted three practical considerations that marked the statute at issue in the *Child Labor Tax Case* as a penalty and not a tax:

> **First**, the tax imposed an exceedingly heavy burden—10 percent of a company's net income—on those who employed children, no matter how small their infraction.

> **Second**, it imposed that exaction only on those who knowingly employed underage laborers. Such scienter requirements are typical of punitive statutes, because Congress often wishes to punish only those who intentionally break the law.

---

[25] *See United States v. Kahriger*, 345 U.S. 22, 29–31 (1953), *overruled in part by Marchetti v. United States*, 390 U.S. 39, 41 (1968).

[26] *See* Ruth Mason, *Federalism and the Taxing Power*, 99 CAL. L. REV. 975, 994–1008 (2011).

[27] *Sebelius*, 567 U.S. 565 (quotation omitted); *see also Nelson v. Sears, Roebuck & Co.*, 312 U.S. 359, 363 (1941) (noting in "passing on the constitutionality of a tax law, we are concerned only with its practical operation").

[28] *Id.* (discussing *Bailey v. Drexel Furniture Co.*, 259 U. S. 20, 38 (1922) (referred to as *Child Labor Tax Case*)).

**Third**, this "tax" was enforced in part by the Department of Labor, an agency responsible for punishing violations of labor laws, not collecting revenue.[29]

Those three considerations were central to invalidating the law at issue in the *Child Labor Tax Case* and bore on how all tax acts should be analyzed.[30] And they are the guideposts courts use to delineate a legitimate tax from an impermissible regulation: "A tax is an enforced contribution to provide for the support of government; a penalty, as the word is here used, is an exaction imposed by statute as punishment for an unlawful act."[31]

In *Sebelius,* the Supreme Court used those three considerations to evaluate the tax at issue in the Affordable Care Act cases and found it passed muster because: the amount due was "less than the price of insurance," "the individual mandate contains no scienter requirement," and the "payment is collected solely by the IRS through the normal means of taxation."[32] It didn't matter that the Act called the "tax" a "penalty"; it operated as a tax and that was all that mattered—the "constitutional question was not controlled by Congress's choice of label."[33]

In *Kurth Ranch,* the Supreme Court analyzed a Montana tax that the petitioners claimed was a penalty and not a tax.[34] As it did in *Sebelius*, the Supreme Court looked to the *Child Labor Tax Case* for guidance in distinguishing between the two: it "recognized that there comes a time in the extension of the penalizing features of the so-called tax

---

[29] *Sebelius*, 567 U.S. at 566.
[30] *Drexel Furniture Co.*, 259 U.S. at 36–39; *Nigro*, 276 U.S. at 341–42; *A. Magnano Co. v. Hamilton*, 292 U.S. 40, 44–45 (1934); *Kurth Ranch*, 511 U.S. at 779.
[31] *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 224 (1996).
[32] *Sebelius*, 567 U.S. at 564–65.
[33] *Id*. at 2595.
[34] *Kurth Ranch*, 511 U.S. at 771–73.

when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment."[35] The Court then looked first at the tax rate: the tax "assessment was more than eight times the drug's market value—a remarkably high tax."[36] Second, the tax only came about when there was illegal behavior—a fact that changed its character.[37] Third, the tax was supposed to be a species of property tax, but it was "levied on goods that the taxpayer neither owns nor possesses when the tax is imposed."[38] Finally, the Court made this observation which goes to the question at hand:

> A tax on "possession" of goods that no longer exist and that the taxpayer never lawfully *possessed has an unmistakable punitive character*. This tax, imposed on criminals and no others, departs so far from normal revenue laws as to become a form of punishment.[39]

Indeed, that was among the "concoction of anomalies, too far-removed in crucial respects from a standard tax assessment to escape characterization as punishment."[40]

The decisions in *Sebelius* and *Kurth Ranch* stand as re-affirmations of principles that had seemingly been retired for the past half-century as Congress primarily invoked its commerce power to justify laws.[41] But when Congress doesn't use its Commerce Clause power and turns to its taxing power, the question comes front center: is this really a tax or an impermissible regulation. In *Sebelius,* the Commerce Clause wasn't a legitimate

---

[35] *Kurth Ranch*, 511 U.S. at 780-81.
[36] *Id*. at 780.
[37] *Id*. at 782.
[38] *Id*. at 783.
[39] *Id*. at 783 (emphasis added).
[40] *Id.*
[41] *See* Mason, *Federalism and the Taxing Power*, 99 Cal. L. Rev. at 1006.

OF WISCONSIN, INC

9

avenue for such legislation.[42] And in *Kurth Ranch*, the Montana tax was challenged under double-jeopardy principles, so the Court had to return to the seminal cases and evaluate the tax against the principles set down a hundred years ago.[43] Those older cases have the same force today as they did when they were decided.

### ii. Section 5861 exceeds Congress's taxing power because it doesn't operate like a tax.

This point must be clear: under the criteria set out in *Sebelius* and *Kurth Ranch*, if the original National Firearm Act from 1936 was challenged today, the Supreme Court would reach the same decision it did in *Sonzinsky*. Remember: the 1936 Act raised revenue, it didn't have a scienter requirement, and the tax was collected by the IRS. The ATF would not be created for another 36 years.[44] But since the tax was upheld in *Sonzinsky*, the statute and its practical operation have changed. Again, when "passing on the constitutionality of a tax law, we are concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it."[45] Under the test in *Sebelius*, the court need only ask three questions to determine whether the law is a taxing measure or a prohibited regulation. First, does it raise any revenue? Second, does it have a scienter requirement? And third, who is collecting the tax? In the last eighty years, each of those essential aspects of § 5861 has changed.

---

[42] 567 U.S. at 552 (noting the "individual mandate, however, does not regulate existing commercial activity").

[43] *Kurth Ranch*, 511 U.S. at 778 (listing cases).

[44] *See* Gun Control Act of 1968, Pub. L. No. 90-618, 82. Stat. 1213.

[45] *Nelson*, 312 U.S. at 363 (internal quotation marks omitted).

First, unlike it was in 1936, the current measure in § 5861 does not raise any revenue. As noted earlier, after 1986, the ATF refused to accept taxes for the transfer of machine guns—and that equally applies to grenades, the destructive device at issue here.[46] Second, while the statute has no express scienter requirement, the Supreme Court in *Staples* held that § 5861 contains an implicit scienter requirement.[47]

It is worth pausing here for a moment to address the logic of *Staples* a little more. There, the decision was not focused on this being a tax violation and thus because we're dealing with "a tax" violation there is no scienter requirement. That was, in fact, the government's argument before the Supreme Court: "in the Government's view, any person who has purchased what he believes to be a semiautomatic rifle or handgun, or who simply has inherited a gun from a relative and left it untouched in an attic or basement, *can be subject to imprisonment, despite absolute ignorance of the gun's firing capabilities, if the gun turns out to be an automatic.*"[48] The Supreme Court didn't buy that § 5861 operated like a tax statute; instead, the Court looked at the statute for what it was: a regulation on certain dangerous firearms and destructive devices.[49] Thus, as the statute operates (especially after *Staples*) there is a definite scienter requirement—one that makes the statute look like and operate as a regulation and not a tax.[50]

---

[46] 27 C.F.R § 101(b)(" No firearm may be registered by a person unlawfully in possession of the firearm except during an amnesty period established under section 207 of the Gun Control Act of 1968 (82 Stat. 1235)); *Dalton*, 960 F.2d at 125 ("The government does not assert that it taxes the illegal possession or transfer of a machinegun.").

[47] *Staples v. United States*, 511 U.S. 600, 605 (1994).

[48] *Id*. at 615 (emphasis added).

[49] *Id*.

[50] *Id*. at 616.

The final feature under *Sebelius* (echoing the *Child Labor Tax Cases*) that dooms § 5861 as a "tax" concerns who collects the putative revenue. Again, no one factor is dispositive but this weighs heavily in the mix; it speaks to the practical effects of the tax and focuses in on what is really happening.[51] Here, the provision is not controlled by the IRS but the ATF—the same federal agency that enforces the federal firearm laws.[52]

Looking at all three points outlined in *Sebelius* and quoted above, they establish that § 5861 is a regulation and not a legitimate tax. This statute raises no revenue; the statute has a scienter requirement; and it's overseen by the ATF, not the IRS. That is, this is a pure prohibition and the taxing power is just a guise for an otherwise prohibited use of congressional power. And under the reasoning in *Sebelius,* it must be struck down as unconstitutional.

That's a powerful statement: few laws are deemed unconstitutional. Yet the argument's logic is irrefutable. Still, it's worth checking the analysis provided under the *Sebelius* factors against the Supreme Court's analysis in *Kurth Ranch.* Again, in *Kurth Ranch,* the Supreme Court focused on the remarkably high tax rate; that the regulation attended to only illegal behavior; and that it was levied on goods that the taxpayer never lawfully possessed.[53] And it held that those qualities removed the Montana "tax" from normal revenue raising measures and made it a penalty.[54]

---

[51] *Sebelius*, 567 U.S. at 565.
[52] *See* Gun Control Act of 1968, Pub. L. No. 90-618, 82. Stat. 1213.
[53] *Kurth Ranch*, 511 U.S. at 782–83.
[54] *Id*.

All three of those factors are present here and support what the analysis in *Sebelius* demands: that this is a regulation beyond Congress's taxing power. First, the tax rate on the grenades is $200, but it can't be paid. So it might as well be a quadrillion dollars. The tax rate is, in essence, so high that no one can pay it because the ATF won't allow anyone to pay it. Impossibility of paying even a nominal sum is akin to a high sum that also can't be paid—the "practical operation" is the same. Second, like the regulation in *Kurth Ranch,* § 5861 only pertains to illegal behavior. While the statute in 1936 could be complied with, eighty years later the regulation only applies to illegal behavior—possessing an otherwise-prohibited firearm or device. And third, the regulation is levied on goods that Morgan could never legally possess. That last point is reflected in the realities of this case. As spelled out above, Morgan is charged with possessing grenades that he didn't register and he didn't buy. There is no excise tax that provides a similar penalty for someone engaging in a *non-*taxable event—simply creating a good that they don't sell.

## II.        Conclusion

In sum, the criteria laid out in *Sebelius* and *Kurth Ranch* establish that the "concoction of anomalies, too far-removed in crucial respects from a standard tax assessment" present in § 5861 establish this as a regulation and not a tax.[55] This is not a case where Congress has silently repealed § 5861; rather, it's based on how § 5861 has evolved and how the practical points of the statute have changed from being a tax into what is now now a pure regulation. It would be hard to imagine the Court in *Sonzinsky* looking at the three facets of the statute that were licit then and have all changed— namely, no revenue being drawn, a scienter requirement, and the ATF not the IRS collecting these taxes—and sustaining the statute. Indeed, if *Kurth Ranch* and *Sebelius* stand for anything, it's that this is not a tax but an impermissible regulation that is beyond Congress's power under its taxing authority.

Dated at Madison, Wisconsin, this 16th day of February, 2024.

Respectfully submitted,

James Morgan, Defendant

*/s/ Joseph A. Bugni*
Joseph A. Bugni
Jonathan Greenberg
FEDERAL DEFENDER SERVICES
 OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
joseph_bugni@fd.org

---

[55] *See Kurth Ranch*, 511 U.S. at 783.