UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

> Plaintiff,

v.                                          Case No. 24-cr-6-jdp

JAMES MORGAN,

> Defendant.

---

### GOVERNMENT'S RESPONSE TO THE DEFENDANT'S MOTION TO SUPPRESS

---

The United States of America responds to the defendant's Motion to Suppress and for *Franks* Hearing (Dkt. 23).[1] For the reasons set forth below, defendant's motion should be denied.

## INTRODUCTION

On December 19, 2023, Magistrate Judge Stephen C. Dries, Eastern District of Wisconsin, authorized a search warrant of the defendant's trailer, truck, storage unit, and person, to search for evidence of violations of 18 U.S.C. § 842(p) (teaching or demonstrating the making or use of weapons of mass destruction), 18 U.S.C. § 229(a) (developing, producing, possessing, or conspiring to use a chemical weapon), 18 U.S.C. §

---

[1] Defendant claimed that the search warrant affidavit contained material factual omissions that require a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). *See* Dkt. 23, at 18. The government responded to the defendant's motion for a *Franks* hearing, *see* Dkt. 25, 26, and Magistrate Judge Crocker denied that motion on February 21, 2024. *See* Dkt. 27. The government re-asserts and incorporates those arguments here.

371 (conspiracy); 18 U.S.C. § 875(c) (communicating threats), and 26 U.S.C. § 5861 (receiving, possessing or making unregistered firearms or destructive devices). *See* Exhibit 1.

The search warrant cited Rule 41(b)(3) of the Federal Rules of Criminal Procedure, a section of Rule 41 that allows for out-of-district physical searches of property when the warrant is sought in "an investigation of domestic terrorism." As set forth in further detail below, the search warrant affidavit explained that defendant was currently living in a mobile pull-behind trailer. The affidavit included surveillance information that the trailer was observed by law enforcement in the Eastern District of Wisconsin and in the Western District of Wisconsin.

Law enforcement agents executed the search warrant on December 21, 2023. In the defendant's trailer, then located in Janesville, Wisconsin, Western District of Wisconsin, agents found unregistered destructive devices. In the defendant's storage unit, located in Whitewater, Wisconsin, Eastern District of Wisconsin, agents found chemicals consistent with chemicals defendant referenced in his social media posts about making chemical weapons.

Defendant was arrested for possessing unregistered destructive devices, pursuant to a criminal complaint issued by the Western District of Wisconsin. On January 10, 2024, a grand jury sitting in the Western District of Wisconsin returned a one count indictment, charging the defendant with possessing six unregistered destructive devices, in violation of 26 U.S.C. § 5861(d). On February 16, 2024, the defense filed the instant motion (Dkt. 23), seeking to suppress evidence seized pursuant to the search warrant.

The defendant's motion should be denied because the affidavit was supported by probable cause and signed by a neutral and detached magistrate judge with jurisdictional authority to issue the warrant. The affidavit properly apprised the magistrate judge of the relevant jurisdictional issues and provided sufficient facts to support that the warrant was being sought in an investigation of domestic terrorism. In any event, law enforcement agents relied upon the Eastern District search warrant in good faith and, under the doctrine of inevitable discovery, a separate warrant for the trailer in the Western District of Wisconsin could have readily been obtained using the same facts in the Eastern District affidavit. There was no violation here, but even if a violation occurred, suppression is not the appropriate remedy.

## GENERAL LEGAL STANDARDS REGARDING SEARCH WARRANTS

The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend IV. Probable cause to support a search warrant exists when the totality of the circumstances set forth in the affidavit allows the conclusion that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The Supreme Court has made clear that "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review." *Id.* at 236. Rather, a reviewing court should pay "great deference" to the magistrate's determinations and limit its review to whether "the magistrate had a substantial basis for concluding that

probable cause existed." *Id.* at 236, 238 (quotation marks omitted). Courts should not invalidate warrants by interpreting affidavits "in a hypertechnical, rather than a commonsense, manner." *Id.*

The Supreme Court has long recognized that not all Fourth Amendment violations are punished by application of the exclusionary rule. *See Illinois v. Gates*, 462 U.S. 213, 223 (1983); *United States v. Leon*, 468 U.S. 897, 920–26 (1984); *Herring v. United States*, 555 U.S. 135, 140 (2009). The Court has reiterated that exclusion "is not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search [or seizure]. The rule's sole purpose . . . is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236 (2011) (internal citations omitted). Consequently, "where suppression fails to yield appreciable deterrence, exclusion is clearly . . . unwarranted." *Id.* at 237.

Under the "good faith" exception, evidence will not be suppressed if law enforcement "reasonably rel[ied] on a warrant issued by a detached and neutral magistrate." *United States v. Leon*, 468 U.S. 897, 913 (1984). This exception exists because "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.* at 922. The good faith exception applies unless the defendant demonstrates that: (1) the issuing judge abandoned the detached and neutral judicial role; (2) the officer was dishonest or reckless in preparing the affidavit; or (3) the warrant was so lacking in probable cause that the officer could not reasonably rely on the judge's issuance of it. *United States v. Reed*, 744 F.3d 519, 522 (7th

Cir. 2014).

ARGUMENT

The defense concedes that the "the affidavit established probable cause that defendant committed a crime," but argues that the Eastern District magistrate judge did not have venue to issue a warrant to search property outside of the Eastern District. This argument is without merit.

A.    The Magistrate Judge Had Venue to Issue the Search Warrant Under Rule 41(b)(3).

Federal Rule of Criminal Procedure 41(b), which governs "venue for a warrant application," generally authorizes a magistrate judge "to issue a warrant to search for and seize . . . property located within the district. . .." The Rule also includes "exceptions that expand a judge's authority to issue extraterritorial warrants." *See In re Search of One Apple iPhone Smartphone*, 628 F. Supp. 3d 155, 160 (D.D.C. 2022).

The Rule allows a judge "to issue a warrant for . . . property within or outside" that judge's district "in an investigation of domestic terrorism or international terrorism" so long as "activities related to the terrorism may have occurred" in the judge's district. Rule 41(b)(3); *One Apple iPhone*, 628 F. Supp. 3d at 160–61.

The government "need not carry a heavy burden" in meeting these Rule 41(b)(3) venue requirements. *See One Apple iPhone*, 628 F. Supp. 3d at 162. When seeking a warrant under the Rule, the government must establish the court's venue pursuant to a "reason to believe" standard. *See One Apple iPhone*, 628 F. Supp. 3d at 161; *United States v. Thorne*, 548 F. Supp. 3d 70, 126 (D.D.C. 2021), as corrected (July 16, 2021). This "reason to believe" burden of proof is appropriate for the venue question because Rule 41(b) is a venue

provision that imposes a procedural rather than a substantive, and a rule-based rather than a constitutional, requirement for obtaining a warrant. *See One Apple iPhone*, 628 F. Supp. 3d at 161 (*citing United States v. Thorne*, 548 F. Supp 3d at 125 (finding same for similar Rule 41(b)(2)).[2]

The "reason to believe" or "reasonable belief" standard "is satisfied by something less than would be required for a finding of 'probable cause.'" *United States v. Thomas*, 429 F.3d 282, 289 (D.C. Cir. 2005) (collecting cases). It is an objective standard that requires "more than a hunch . . ., but less than a probability." *United States v. Bohannon*, 824 F.3d 242, 255 (2d Cir. 2016). "[R]eason to believe is not a particularly high standard, but it does require specific and articulable facts that, taken together with rational inferences drawn therefrom, provide a particularized and objective basis for thinking" that the venue provision is satisfied. *Id.*

1. **The government established a reasonable belief that the warrant was being sought in an investigation of domestic terrorism**.

There is no statutory definition for "investigation of domestic terrorism." "Domestic terrorism" is defined under federal law as activities that:

(A)    involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State;

(B)    appear to be intended—
        (i)      to intimidate or coerce a civil population;
        (ii)     to influence the policy of a government by intimidation or coercion; or
        (iii)    to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

---

2. The Rule also permits a magistrate judge to issue a warrant for "property outside the district if the . . . property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed." Rule 41(b)(2).

(C)      occur primarily within the territorial jurisdiction of the United States.
18 U.S.C. § 2331(5).

The Federal Bureau of Investigation (FBI) can open a domestic terrorism investigation "if there is an articulable factual basis for the investigation that reasonably indicates that the group or organization may have engaged or may be engaged in, or may have or may be engaged in planning or preparation or provision of support for ... domestic terrorism as defined in 18 U.S.C. [§] 2331(5) involving a violation of federal criminal law."[3]

To determine whether the government had met its burden to establish a reasonable belief that a warrant was being sought in an "investigation of domestic terrorism," the District of Columbia adopted a two-step approach that seems appropriate here. *See One Apple iPhone*, 628 F. Supp. 3d at 163. Using that approach, a court first "must assess whether the government has opened and is engaged in an investigation of domestic terrorism." *Id*. Next, a court "must evaluate the evidence proffered in the affidavit to determine whether there is 'reason to believe' that the activities under investigation fall within the § 2331(5) definition of 'domestic terrorism.'" Id.

a. **The warrant established that the government had opened and was engaged in, an investigation of domestic terrorism**.

The affidavit in this case sufficiently established this first prong of the analysis. The affiant for the search warrant was "assigned to the Joint Terrorism Task Force in

---

[3] U.S. Dep't of Justice, The Attorney General's Guidelines for Domestic FBI Operations  (2008), https://www.justice.gov/archive/opa/docs/guidelines.pdf.

Milwaukee," and investigated "matters involving violations of federal law related to counterterrorism and domestic terrorism. . .." Exhibit 1, at 1. The government indicated, including by invoking Rule 41(b)(3), that it was in fact investigating domestic terrorism. *See One Apple iPhone*, 628 F. Supp. 3d at 163.

> b. **The warrant established reason to believe that the activities under investigation fall within the § 2331(5) definition of domestic terrorism**.

There are no federal criminal statutes expressly prohibiting "domestic terrorism." *See One Apple iPhone*, 628 F. Supp. 3d at 166 ("Because domestic terrorism is not itself a crime, the government investigates and prosecutes domestic terrorism through a variety of non-terrorism statutes."). Rather, "domestic terrorism" is a definition for other criminal acts dangerous to human life committed on U.S. soil that appear intended to coerce a civilian population or influence or affect the conduct of government. It follows then that investigations of domestic terrorism are multi-faceted and require law enforcement to investigate whether, when, and where crimes occurred; whether those crimes were dangerous to human life; and the individual's motivation behind committing the crimes.

In his motion, defendant incorrectly focuses on only the one offense for which defendant is currently charged, rather than the larger investigation into his activities as a whole. Defendant claims that the "affidavit is silent on why the defendant possessed the devices, and whether it appeared he intended to engage in domestic terrorism." Dkt. 23, at 4. The motion similarly faults the affidavit for failing to "link[] the destructive devices to [an] intent" to intimidate or coerce civilians. *Id*. at 14; *see also id*. at 5 (stating that the affidavit contains "no allegation that he possessed the devices" for any of the three

purposes stated in Section 2331(5)(B)). The defendant misconstrues the rule as focusing on the offense; the plain language of the Rule focuses instead on the "investigation" and "activities related to" that investigation. *See United States v. Brown*, No. 21-CR-348 (M.D. Fl. July 28, 2022) (ECF 196, at 5) (defendant's argument regarding jurisdiction "erroneously focuses on the offenses identified in the affidavit rather than investigation of which they are a part").

To get the search warrant, the government did not have to establish probable cause that the defendant committed a domestic terrorism-related offense or probable cause that the defendant was dangerous. *See One Apple iPhone*, 628 F. Supp. 3d at 166 ("Because domestic terrorism is not itself a crime, the government investigates and prosecutes domestic terrorism through a variety of non-terrorism statutes."). The government had to establish that the warrant was being sought in a "domestic terrorism investigation," and then establish probable cause that evidence of a federal criminal violation was currently located at the place to be searched. Rule 41(b)(3) provides venue to a magistrate judge "in an investigation of . . . terrorism," so long as any "activities related to the terrorism" occurred in the magistrate judge's district. Rule 41(b)(3) is not limited to any specific crime, as indicated by the Rule's plain language, structure, purpose, and legislative history.

It's worth noting that the FBI opens far more domestic terrorism cases than are prosecuted. See pp. 25-26, https://www.fbi.gov/file-repository/fbi-dhs-domestic-terrorism-strategic-report-2023.pdf/view. The universe of valid investigations into potential domestic terrorism is (and should be) greater than the number of cases that

involve actual acts of domestic terrorism.

Rule 41(a)(2)(D), which defines the phrase "domestic terrorism" by reference to Section 2331(5), encompasses "activities" rather than specified crimes. And Rule 41(b)(3) refers to "investigation" of those "activities." In other words, when the government seeks evidence in a terrorism investigation and there is reason to believe that the property to be searched contains evidence of criminal "activities related to the terrorism," Fed. R. Crim. P. 41(b)(3), nothing in these provisions requires or authorizes the magistrate judge to limit the warrant to search for evidence of certain specific crimes. In fact, "[b]ecause domestic terrorism is not itself a crime, the government investigates and prosecutes domestic terrorism through a variety of non-terrorism statutes," *One Apple Iphone*, 628 F. Supp. 3d at 166, and there is no list of "domestic terrorism" crimes.

Indeed, Rule 41 conspicuously does *not* reference the section of the U.S. Code that defines "[f]ederal *crimes* of terrorism." 18 U.S.C. § 2332b(g)(5) (emphasis added). And other sections of the U.S. Code make clear that Congress knew how to refer to a broad act of terrorism without reference to a specific crime of terrorism. *See, e.g.*, 18 U.S.C. § 226 (criminalizing bribery with "intent to commit . . . terrorism" as defined in Section 2331); 18 U.S.C. § 1505 (enhancing penalty for obstruction of proceedings if the "offense involves . . . terrorism" as defined in Section 2331); 18 U.S.C. § 1425 (enhancing penalty for unlawfully procuring citizenship "if the offense was committed to facilitate an act of international terrorism" as defined in Section 2331). As with these statutes, when Congress enacted Rule 41(b)(3), it made clear that the triggering event was the terrorism activities (and the "investigation" into those activities), not a specific offense.

The structure of Rule 41 further supports this conclusion. Rule 41 sets forth in logical, chronological fashion the procedure for issuing a warrant, explaining first who can issue a warrant and in what circumstances (sections (b) and (c)), then how the warrant is issued and executed (sections (d), (e), and (f)), and finally what to do with the warrant and the evidence after the seizure (sections (g), (h), and (i)). Section (b) is therefore the first step in the process, and it ensures that the magistrate judge has jurisdiction to consider the warrant. Section (b) is not limited by the remaining sections of Rule 41. Once a magistrate judge determines that she has jurisdiction to consider and issue the warrant—pursuant to one of the subsections of section (b), as described below—there are no further limitations on the authority of the magistrate judge related to her jurisdiction or the offense under investigation.

Moreover, the structure of Rule 41(b) confirms that Rule 41(b)(3) expands a magistrate's traditional territorial reach. Section (b) provides a magistrate judge with jurisdiction to issue a warrant if certain prerequisites are met, and subsections (b)(2) through (b)(6) grant authority to issue warrants to search and seize property and persons who may be physically located outside the judicial district. Like its sister subsections, subsection (b)(3) expands the magistrate judge's typical territorial jurisdiction. By its plain terms, "in *investigations* of domestic terrorism," a magistrate judge has authority to issue warrants for property located outside the district provided that "activities related to the terrorism may have occurred" within the district. Rule 41(b)(3) is thus not cabined to evidence of specific predicate offenses but rather provides venue for a warrant in a terrorism "investigation." Simply, under subsection (b)(3), a magistrate judge's

jurisdiction may be satisfied by the location of the terrorism activities rather than only the location of the evidence.

Finally, legislative history supports a conclusion that the focus under Rule 41(b)(3) is on the broader investigation, rather than specific offenses. *See One Apple iPhone*, 628 F. Supp. 3d at 167 ("As with the amended language in Rule 41, the legislative history demonstrates congressional focus on terroristic 'activities' as opposed to 'crimes'"). In 2001, with the passage of the USA PATRIOT Act, Congress amended Rule 41 to include subsection (b)(3). Pub. L. 107–56, 115 Stat. 272, § 219 (Oct. 26, 2001). The title of Section 219 of the Act is "Single-Jurisdiction Search Warrants for Terrorism," *id.*, evidencing Congress's intent that, in terrorism investigations, the government should have the option of bringing warrant applications to a single magistrate judge. The intended purpose of Rule 41(b)(3) is to ensure investigative efficiency and expediency in terrorism investigations, as terrorist activities commonly involve multiple overlapping crimes, which are not themselves "terrorism offenses." Requiring law enforcement to seek multiple search warrants in various districts depending on where the property is located and which predicate offense the evidence pertains to is the precise inefficiency that Rule 41(b)(3) sought to remedy.

Thus, the magistrate judge here had authority to authorize the search warrant so long as the warrant pertained to an "investigation of domestic terrorism." Fed. R. Crim. P. 41(b)(3). The defendant's focus on one specific offense, rather than the investigation, is misplaced.

Even if, however, the government had to make some showing in the affidavit that

defendant had engaged in "domestic terrorism," the affidavit made that showing because
the affidavit identified acts "dangerous to human life" that were "a violation of the
criminal laws of the United States or of any State," that "appeared intended to coerce a
civilian population or influence or affect the conduct of government." 18 U.S.C. §
2331(5)(A).

    The affidavit identified many acts taken by the defendant, including:

- In May 2023, he sent messages on Gab indicating his plan to use chlorine gas against a group of up to twenty government agents. He indicated he had "a different plan entirely" for the "goobermint coming for the guns. . . . We'll defeat them without firing a single shot." In that instance, he would "react[] calcium hypochlorite with hydrochloric acid, producing a huge amount of chlorine in the confined space of the apartment. . . ." He said he would then "watch. Goobermint like a bunch of retards is gonna do their fave strategy where 20 guys charge in all at once." He demonstrated that he knew that the effect of the chlorine gas would be to disable those twenty government agents, saying "once they haven't heard from or seen their strike team for a good minute, they're gonna be really scared. Lol." Exhibit 1, at 8–9.

Weapons generally:

- Defendant spoke with law enforcement in November 2019, and admitted making several homemade weapons to protect himself. Later in November 2019, the defendant posted on Facebook about the encounter with law enforcement regarding "weapons I invented." Exhibit 1, at 5–6.

Firearms and destructive devices:

- In November 2019, the defendant posted on Facebook that, "any gun I do ever have will be undocumented." Exhibit 1, at 6.

- Defendant purchased an AK-47 in April 2020, and a rifle in June 2022. *Id*. at 13–14. In June and July 2022, he posted a photo of himself holding a semi-automatic rifle, and a photo of that rifle with two high-capacity drum magazines. *Id*. at 14.

- In May and July 2022, defendant posted a video displaying multiple firearms, including a semi-automatic rifle, revolver, ammunition, and high-capacity

drum magazines. *Id*. at 13–15.

- Stored in defendant's Google account was an 80-page document entitled, Home Expedient Firearms-9mm SMG.pdf, a digital book with instructions on how to make a homemade submachine gun. *Id*. at 20.

- In November 2023, Fox Meadows apartment employees stated that defendant's lease was not renewed in part due to concerns about his possession of a homemade flamethrower and unsecured firearms, and his open carrying of a handgun. *Id*. at 21.

- In March 2020, defendant recorded a video showing the supplies necessary to create homemade destructive devices, and stated, "for making the things that go boom." *Id*. at 12.

- In February 2021, defendant posted on social media that he was starting a company to build artillery, specifically "a 7.62cm field gun" that "would only cost around $1500 . . . about the same price as your typical AR15." He described some of its composition, including that it would use paper cartridges. The reason for that, he said, was that the "law is a little funny with artillery. Artillery cannot use 'fixed cartridges' and artillery shells are 'destructive devices.' Solely to get around this and for no other reason, my artillery pieces will use paper cartridges." He said he was looking for investors, who should talk with him if "affordable artillery is something you'd like to see. . . ." *Id*. at 16.

- In September 2021, defendant posted a video explaining his plan to build a cannon-style weapon, "mass produce them" for approximately $1,000 to $1,500 each, and make "artillery available to the common man." *Id*.

- In April 2022, defendant took a photo of supplies to make destructive devices, including smokeless powder, cardboard containers, hobby fuse, glue, and nails. *Id*. at 13.

- In May 2022, defendant posted a video showing the components and design used to create a gasoline flamethrower, which he was "finishing up." *Id*. at 17. In a video he posted in August 2022, that flamethrower appeared to be in the background in his apartment in Whitewater, Wisconsin.

Other Posts About Chemical weapons:

- In August 2019, defendant posted on Facebook videos regarding his weapon creation and how to create a smoke cloud, describing it as a "choking agent"

and noting his "success." In November 2019, defendant posted on Facebook that he "was a chemistry major in college" and "know what I'm doing." He specifically said, "Like I even really need a conventional weapon? I'm a weapon designer mf! I can likely invent something better anyway." Exhibit 1, at 4, 6.

- Defendant made statements demonstrating his knowledge that two chemicals, calcium hypochlorite and hydrochloric acid, combine to generate chlorine gas. In March 2020, he recorded a video (saved to Google Photos) displaying the chemicals for making, "a lot of chlorine very quickly." He took a photo of the same chemicals in October 2021. In July 2022, he visited webpages where one could purchase those chemicals. *Id*. at 6–8.

- In July 2022, defendant took a photo of the chemistry equipment setup in his apartment. In November 2023, a maintenance technician at Fox Meadows stated that, in the spring of 2023, he observed chemistry equipment set up in defendant's bedroom. *Id*. at 8.

- A video defendant posted in October 2022 revealed a book titled, "Anarchist Cookbook," which contains instructions on how to create improvised weapons and explosives. *Id*. at 15.

Considered as a whole, the affidavit provided sufficient facts to find that defendant engaged in acts that threatened human life and violated federal law, including the offenses identified in the affidavit. The defendant concedes this element, stating that "possessing a destructive device is dangerous and illegal." Dkt. 23, at 3.

The affidavit identified defendant's potential motivations. The affidavit detailed at length defendant's own statements discussing his motivations for his conduct—namely, his plan to use chemical weapons against twenty law enforcement agents, and his racial and political motivations. It is simply not the case, as the defendant claims, that "no allegations in the warrant indicate that defendant's activities were intended to intimidate or coerce either civilians or the government." Dkt. 23, at 12. Such a characterization ignores defendant's statements about his intentions, detailed below, about making the

government "afraid," violence against specific groups within this country's civil population, and using a chemical weapon against twenty law enforcement officers.

Moreover, the affidavit contained detailed facts providing reason to believe that the investigation involved activities that "appear[ed] to be intended" to "influence the policy of a government by intimidation or coercion." 18 U.S.C. § 2331(5)(B)(ii). For instance, in October 2019, he discussed "forming my own militia" called "The New American Minutemen." *Id*. at 5. He described various government policies in connection with forming a militia:

> America has been losing their God given freedoms one by one. I intend to defend these. I am enraged. Our government taxes us endlessly, forces us to send our children to schools they control, control the press with their laws, and they've established over 700 imperialistic bases overseas and expect us to pay for them. . . . Seems like we need to dust off our guns and do this again, my fellow Americans. And if anything happens to me because I said this . . . well that should just prove our basic rights no longer exist. Who will answer this call to arms? Who's with me?

*Id*. This call to violence by the defendant, then, was made in response to the government's policy decisions, specifically regarding taxes, schools, the press, and foreign policy.

In a video defendant posted in November 2019, he stated that the acid sprayers "were part of the reason the government came to my house." *Id*. at 10. He continued that, "People should not be afraid of their government, governments should be afraid of their people. So here's how you make a device that shoots sulfuric acid!" *Id*. The defendant directly connected his conduct, constructing dangerous weapons, with intimidating the government, or in his words, making it "afraid."

In February 2021, defendant posted to social media that he "noticed that the civilian arsenal is lacking in artillery due primarily to its cost and I want to fix this. So I'm

starting a company whose mission is to make artillery affordable to the common man."
*Id*. at 16. He described a cannon-style weapon he intended to build, and how his design
would "get around" the law on destructive devices. *Id*. This conduct, meant to provide
cannon-style weapons to the common man and the civilian arsenal, is consistent with
defendant's earlier stated intention to form a militia, send a call to arms, and "dust off our
guns and do this again, my fellow Americans. . . ."

Also consistent with defendant's plans to intimidate the government were his
comments in May 2023 about using chlorine gas to incapacitate twenty law enforcement
agents. He indicated that, if the government came for the guns, he had a "plan" to "defeat
them without firing a single shot." In that scenario, he would "react[] calcium
hypochlorite with hydrochloric acid, producing a huge amount of chlorine in the
confined space of the apartment. . . ." At that point, he would "watch. Goobermint like a
bunch of retards is gonna do their fave strategy where 20 guys charge in all at once." He
showed that he knew the effect would be to disable those government agents, stating
"once they haven't heard from or seen their strike team for a good minute, they're gonna
be really scared. Lol." *Id*. at 8–9. Again, then, defendant discussed a plan in which he
would employ violence against the government and make it "really scared."

In November 2023, the defendant posted on Gab that "the one thing above all
other things they nail into your head over and over from the youngest age is 'violence is
not the answer.' You know what? It literally is an answer." *Id*. at 20. Again, defendant
advocated for violence against the government, consistent with earlier statements.

The defendant's motion attempts to ignore some of defendant's conduct and

minimizes other conduct as merely "off-putting" or "disturbing" fantasies. Dkt. 23, at 16. Viewed in its totality, however, the affidavit reveals that his conduct over several years included: (1) putting out "a call to arms" to form a militia, and telling "fellow Americans" to "dust off our guns and do this again," in response to policy differences with the government; (2) building and demonstrating sulfuric acid guns that would make the government "afraid"; (3) building artillery affordable to the "common man" and adding cannons to the "civilian arsenal"; (4) describing a plan to incapacitate twenty law enforcement officers using chlorine gas, which would make the government "really scared"; and (5) posting that violence "literally is an answer." During the times he made these statements, the defendant was engaged in using chemicals and building weapons, including chlorine gas, a choking agent, acid sprayer, flamethrower, and various firearms and destructive devices. In totality, then, the facts in the affidavit provided reason to believe that the defendant's activities appeared to be intended to influence government policy by intimidation. *See United States v. Christianson*, 586 F.3d 532, 539 (7th Cir. 2009) (finding that the Sentencing Guidelines § 3A1.4 enhancement for terrorism applied where the defendant's chosen method "was not a peaceful protest with speeches, songs, and a petition" but rather violent conduct).[4]

      Additionally, the affidavit included detailed facts providing reason to believe that

---

[4] Of course, the standard for imposing the terrorism enhancement is higher, requiring that the offense be "a felony that involved, or was intended to promote, a federal crime of terrorism. . . ." U.S.S.G. § 3A1.4. The term "federal crime of terrorism" is defined as an offense that is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5). As discussed above, the standard at issue here requires only an *investigation* of domestic terrorism, rather than an offense.

the investigation involved activities that "appear[ed] to be intended" to "intimidate or coerce a civil population." 18 U.S.C. § 2331(5)(B)(i). The affidavit apprised the court that in August 2019, the defendant recorded videos about creating an acid sprayer in response to being threatened by Antifa. He demonstrated use of the acid sprayers and the burning effect they have on concrete and clothing, and at one point stated, "chemically burn commies alive and melt their faces off for $10."[5] *Id*. at 9. The defendant discussed the use of violence in the context of a political philosophy, and against a specific group ("commies"), with which he disagreed. He told others to "message me on Facebook to take advantage of this amazing deal," and directed them where to purchase sulfuric acid. *Id*. at 9–10. The defendant, then, was building acid sprayers to respond to threats from Antifa, and to cause physical harm to those with whom he had political differences. *See Christianson*, 586 F.3d at 539 ("if they use violence and intimidation to further their views, they are terrorists.").

In December 2019, the defendant again posted a video about an acid sprayer, this time describing it as an "experimental weapon." *Id*. at 11. He described the acid as "nasty stuff," and the black and yellow color scheme was like a bee or wasp to warn someone "that I'm about to shoot something really nasty at you." *Id*. at 10. The defendant expressly considered the intimidation factor involved with the acid sprayers he created.

In May 2023, the defendant made a series of posts referencing specific groups within this country's civil population:

---

[5] This statement, like several others the defendant made, belies his claim that "there's no assertion or indication in the warrant that the defendant planned to hurt . . . anyone to further his political ends." Dkt. 23, at 15.

- in response to a screenshot of a post about a white teacher being asked to show respect by kissing a black student's hand, the defendant stated: "Put that [African American] on a tree." This communication appeared in a group titled in part as a home for "Proud racists";

- The defendant said it was "about time Americans had a heart to heart talk about our [J]ewish problem";

- The defendant thought "US law should only protect US citizens. If you kill an illegal, I think literally nothing should happen to you."

*Id*. at 19. In these posts, the defendant voiced his racial motivations and expressly connected violence with certain groups of people in the United States. Though the defendant attempts to downplay his statements as mere "disdain" for or "animus" toward other racial groups, Dkt. 23 at 15, the social media posts reveal the defendant publicly promoting violence against these groups, which is unquestionably designed to intimidate the populations of these groups.[6]

Thus, the affidavit provided reason to believe that the defendant's activities appeared to be intended to "intimidate" a civil population within this country—namely, political opponents (Antifa or "commies"), and racial groups (African Americans, illegal immigrants, and Jewish-Americans). *See Christianson*, 586 F.3d at 539 (differentiating peaceful protest with violence and stating that "if they use violence and intimidation to further their views, they are terrorists.").

Finally, the affidavit included information providing reason to believe that the

---

[6] This is not a case involving speech alone, as defendant stated his intentions while engaged in a long pattern of admittedly dangerous conduct, including his use of chemicals and building of weapons. *See United States v. Elshinawy*, No. 16-CR-009, 2018 WL 1521876, at *24 (D. Md. Mar. 28, 2018), *aff'd*, 781 F. App'x 168 (4th Cir. 2019) ("speech does not stand alone; this is not a case of mere words. It is clear that defendant was committed to jihad; he had in mind a terrorist 'project,' *i.e.*, a plan of attack, and he was working towards accomplishing it.").

investigation involved activities that "appear[ed] to be intended" to "affect the conduct of a government by mass destruction." 18 U.S.C. § 2331(5)(B)(iii). In May 2023, defendant sent messages on Gab revealing a plan to use chlorine gas against a group of up to twenty government agents. He indicated he had "a different plan entirely" for the "goobermint coming for the guns. . . . We'll defeat them without firing a single shot." In that instance, he would "react[] calcium hypochlorite with hydrochloric acid, producing a huge amount of chlorine in the confined space of the apartment. . . ." He said he would then "watch. Goobermint like a bunch of retards is gonna do their fave strategy where 20 guys charge in all at once." He demonstrated that he knew that the effect of the chlorine gas would be to disable those twenty government agents, saying "once they haven't heard from or seen their strike team for a good minute, they're gonna be really scared. Lol." Exhibit 1, at 8–9.

While the defendant again attempts to minimize this plan as merely "hypothetical," the fact that a plan was not borne out does not negate defendant's apparent intent. *See Elshinawy*, 2018 WL 1521876, at *24 ("It is of no moment that an attack was not consummated by defendant; inchoate offenses are subject to" the Guidelines enhancement for terrorism). Certainly, planning to use chlorine gas as a weapon to incapacitate twenty law enforcement agents is activity that appeared to be intended to affect the government's conduct by mass destruction. And the defendant specifically referenced the government's conduct, what he called "their fave strategy," and how his plan would affect that strategy, in that it would cause their "strike team" to not be seen or heard from. His plan would also make those in government or law enforcement "really scared."

If the government was required to Under each of the three prongs, the affidavit provided sufficient information for the Magistrate Judge to determine that venue was sufficient, as the activities under investigation "appear[ed] to be intended": (1) "to intimidate or coerce a civil population"; (2) "to influence the policy of a government by intimidation. . . ."; or (3) "to affect the conduct of a government by mass destruction. . . ." 18 U.S.C. § 2331(5)(B)(i) through (iii).

The affidavit plainly satisfied the final prong of the domestic terrorism definition in 18 U.S.C. § 2331(5)(C), that the events described above took place while defendant was residing in Wisconsin, "within the territorial jurisdiction of the United States." *See* Exhibit 1 at 21. The defendant concedes this, as he must. *See* Dkt. 23, at 3 ("The defendant's alleged activity satisfies the . . . third element[] — . . . it occurred in the United States."). As many of defendant's acts occurred in the Eastern District of Wisconsin, the Magistrate Judge had "authority to issue a warrant for a person or property within or outside th[e] district." Fed. R. Crim. P. 41(b)(3); *see One Apple iPhone*, 628 F. Supp. 3d at 163 (requirement that terrorism activities "*may have* occurred," and not actually occurred, in the district "is a seemingly low threshold").

In summary, the facts contained in the affidavit established that the government's investigation of defendant related to his use of chemicals and building of weapons, including chlorine gas, a choking agent, acid sprayer, flamethrower, and various firearms and destructive devices. *See* Exhibit 1, at 4–20. As described above, the affidavit also detailed defendant's own stated intentions, which included statements related to influencing government policy by intimidation, intimidating different groups in this

country's civil population, and affecting government conduct by mass destruction.
Accordingly, specific and articulable facts supported the Magistrate Judge's conclusion
that the proposed search warrant related to a domestic terrorism investigation under
Section 2331(5).

B.     Suppression is Not the Appropriate Remedy for any Alleged Violation.

Even if this Court were to find a violation as the defendant alleges, suppression is
not warranted. The most critical factor in determining whether the exclusionary rule
should be applied is the potential deterrence of Fourth Amendment violations in the
future. *Herring*, 555 U.S. at 141. Any deterrent effect must be weighed against the
substantial societal costs that flow from the suppression of evidence. *Id*. These costs
include setting aside "reliable, trustworthy evidence" of a defendant's guilt, thereby
"suppress[ing] the truth and set[ting] the criminal loose in the community without
punishment." *Davis*, 564 U.S. at 237. The exclusion of evidence is an "extreme sanction"
that should be viewed as a "last resort," not a "first impulse." *Herring*, 555 U.S. at 140.
For this reason, the Supreme Court has cautioned that:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that
> exclusion can meaningfully deter it, and sufficiently culpable that such deterrence
> is worth the price paid by the judicial system. As laid out in our cases, the
> exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct,
> or in some circumstances recurring or systemic negligence.

*Herring* at 702.

"Evidence is admissible when the connection between unconstitutional police
conduct and the evidence is remote or has been interrupted by some intervening
circumstance, so that "the interest protected by the constitutional guarantee that has been

violated would not be served by suppression of the evidence obtained." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). To the extent the defendant claims that the alleged violation was based on law enforcement's negligence, the Supreme Court has counseled that the exclusionary rule is intended to deter "flagrant" and "purposeful" misconduct. *Id.* at 2063. In *Strieff*, the officer was "at most negligent." *Id.* Like here, there was no indication that this warrant was part of recurrent or systemic police misconduct, particularly when the Court has defined such flagrancy as "severe police misconduct" rather than the "mere absence of proper cause." *Id.* at 2064. Simply stated, a good-faith error in any one warrant does not constitute a concerted effort by law enforcement to mislead.

As the Seventh Circuit has stated, "violations of federal rules do not justify the exclusion of evidence that has been seized on the basis of probable cause and with advance judicial approval." *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008) (citing *United States v. Cazares–Olivas,* 515 F.3d 726, 730 (7th Cir. 2008), and *United States v. Trost,* 152 F.3d 715, 722 (7th Cir. 1998)). The remedy of allowing a defendant to go free based on a violation of Rule 41's requirements for obtaining a proper search warrant would be "wildly out of proportion to the wrong." *Berkos*, 543 F.3d at 396 (quoting *Cazares–Olivas,* 515 F.3d at 730); *see also United States v. Vann*, No. 07-CR-247MRJRLE, 2007 WL 4321969, at *22 (D. Minn. Dec. 6, 2007) (concluding that warrant executed on property outside the district constituted Rule 41(b) violation that did not justify suppression).

Here, it cannot be said that law enforcement agents engaged in deliberate, reckless, or grossly negligent misconduct. Instead, they provided sufficient probable cause to search, apprised the magistrate judge of the relevant jurisdictional provisions and facts

sufficient to find reason to believe that venue was proper under those provisions, and obtained a warrant from the magistrate judge in advance. *United States v. Burgos-Montes*, 786 F.3d 92, 109 (1st Cir. 2015) ("[t]he exclusionary rule should be limited to those situations where its remedial objectives are best served; *i.e.*, to deter illegal police conduct, not mistakes by judges and magistrates."). Even if this Court were to find a violation of Rule 41, then, suppression is not an appropriate remedy. *See Berkos*, 543 F.3d at 396 (the inapplicability of the exclusionary rule "alone" would merit denying defendant's claim that Rule 41(b)'s jurisdictional limitation rendered warrant invalid.).

Even if the Court determines that Rule 41(b)(3) did not authorize the Magistrate Judge to issue the search warrant of the defendant's property, it should nevertheless deny the defendant's motion under the good faith exception to the exclusionary rule. The Seventh Circuit has held that the good faith exception applies to search warrants issued for property outside of a magistrate judge's jurisdiction. *See United States v. Grisanti*, 943 F.3d 1044, 1050 (7th Cir. 2019); *see also United States v. Taylor*, 935 F.3d 1279, 1290–92 (11th Cir. 2019). The inquiry under the good faith analysis is whether a reasonable officer would know from the face of the warrant that it was invalid. *Grisanti*, 943 F.3d at 1049.

In relying on the search warrant issued by Magistrate Judge Dries, law enforcement agents acted reasonably and in good faith. In fact, the defendant does not point to any exceptions that would prevent the good faith exception to the exclusionary rule from applying. As discussed above, the defendant alleges that the affiant intentionally or recklessly omitted material information from the affidavit, but as those do not rise to a level justifying a *Franks* hearing, they do not prevent application of the

good faith exception. *See United States v. Spears*, 673 F.3d 598, 605–07 (7th Cir. 2012) (applying good-faith exception where omissions and inconsistencies were immaterial); *United States v. Xiang*, 12 F.4th 1176, 1184 (10th Cir. 2022) (good-faith exception applied because "affiant's omission was, at most, negligent" and negligence alone cannot support suppression). Moreover, the affiant did not attempt to mislead the magistrate judge as to venue in this case—the search warrant affidavit clearly identified the property to be searched that was mobile and had been observed in locations in both the Eastern District and the Western District of Wisconsin. *See, e.g.*, Exhibit 1 at 21–22. The affiant accurately identified the pertinent legal provisions governing venue. *Id.* at 2. There was no countervailing legal authority or court decision that contradicted the United States' position on jurisdiction. Thus, there was no attempt to mislead Magistrate Judge Dries, and a reasonable officer would be justified in relying on his determination that he had authority to issue the search warrant.

There is no allegation or evidence that the magistrate judge abandoned his judicial role. The defendant does not contest that the warrant contained probable cause. The agents acted in good faith in relying on the duly reviewed and approved search warrant, and suppression is not an appropriate remedy in this case. *See Leon*, 468 U.S. at 922 ("[S]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search."). The search warrant in this case easily satisfied the factors under *Leon*.

There is no indication that agents intentionally or recklessly disregarded Rule 41's

requirements, a key aspect in deterring police misconduct through the exclusionary rule. *See United States v. Deichert*, 232 F. Supp. 3d 772 (E.D.N.C. 2017) (declining to suppress evidence obtained from a warrant permitting use of a seized computer server, which was issued in a district where the magistrate judge did not have statutory authorization to issue it); *see also Grisanti*, 943 F.3d at 1050 (suppression from the warrant "would be inappropriate because penalizing the officer for the magistrate's arguable error rather than his own cannot logically contribute to the deterrence of Fourth Amendment violations."); *United States v. Austin*, 230 F. Supp. 3d 828, 837–38 (M.D. Tenn. 2017) ("To the extent there was an error in determining the parameters of Rule 41's territorial jurisdiction, that error rests with the magistrate judge, not with the agents. Under these circumstances, there is little deterrent value to be gained through suppression."); *United States v. Darby*, 190 F. Supp. 3d 520, 537 (E.D. Va. 2016) (calling "absurd" the attempt "to attribute to the FBI agents that sought the warrant [] legal expertise . . . it is hard to fathom why the FBI would go through the trouble of seeking a warrant in deliberate violation of Rule 41(b). If they were so inclined to undermine individual rights, they might have forgone seeking the warrant in the first place."). The same goes for the agent here, who acted in good faith in seeking a warrant to search.

In any event, under the doctrine of inevitable discovery, a separate warrant for the trailer in the Western District of Wisconsin could have readily been obtained using the same facts in the Eastern District affidavit, pursuant to Rule 41(b)(1) & (b)(2) Accordingly, suppression is not warranted. As the Seventh Circuit explained in *United States v. Sims*, 553 F.3d 580, 584 (7th Cir. 2009):

The Supreme Court has in the name of "inevitable discovery" created an exception to the rule for cases like this in which the harm caused by an illegal search to the values protected by the Fourth Amendment is not merely slight in relation to the social benefits of the search, but zero. It is zero because, as in *United States v. Stefonek*, supra, 179 F.3d at 1033–34, had the police complied with the Fourth Amendment the consequences for the defendant would have been exactly the same as they were. The search would have been authorized, would have taken place, and would have been identical in scope, both as to places searched and things seized, to the search that the police did conduct. The defendant would have been no better off had the warrant complied with the Fourth Amendment. *Cf. United States v. Tejada*, 524 F.3d 809, 813 (7th Cir.2008).

As the *One Apple iPhone* court found, Rule 41(b)(3) is a venue provision that imposes a procedural rather than a substantive, and a rule-based rather than a constitutional, requirement for obtaining a warrant. *See One Apple iPhone*, 628 F. Supp. 3d at 161 (*citing United States v. Thorne*, 548 F. Supp 3d at 125 (finding same for similar Rule 41(b)(2)). It follows that a violation of the rule does not offend due process, nor does it require a constitutional-based remedy like suppression of evidence.

For these reasons, the Court should deny the defendant's Motion under the good faith exception as well.

CONCLUSION

In view of the foregoing, the United States respectfully requests that the Court deny the defendant's Motion to Suppress.

Dated at Madison, Wisconsin, this 21st day of March 2024.

TIMOTHY M. O'SHEA
United States Attorney

By: /s/_____
MEREDITH P. DUCHEMIN
Assistant United States Attorney