UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

*Plaintiff,*

v.                                                  Case No. 24-cr-6-jdp

JAMES MORGAN,

*Defendant.*

**REPLY IN SUPPORT OF MOTION TO SUPPRESS**

James Morgan, by counsel, files this reply in support of his motion to suppress. With the government's response in hand, one thing is settled: the parties agree that the Court must independently evaluate the affidavit to determine whether the investigated activities fell "within the § 2331(5) definition of 'domestic terrorism.'"[1] Everything else is disputed. The government asserts that it met its Rule 41(b)(3) burden, but it relies on Morgan's statements taken out of context. The government also contests that the affidavit's omissions triggered *Franks*, but it downplays their materiality and necessity to the jurisdictional question. Alternatively, it argues that a Rule 41(b) violation isn't subject to suppression, but it relies on technical-violation cases and fails to grapple with the error's constitutional dimension. Lastly, it invokes good faith and inevitable discovery as fallback positions, but the record supports neither exception to the exclusionary rule. Because the extra-district warrant was facially void, suppression must follow.

---

[1] R.34:7 (citation omitted).

## I.      The extra-district warrant violated Rule 41(b)(3).

Before rebutting the government's various arguments as to whether Rule 41(b)(3) authorized the warrant, it's helpful to underscore two points about the rule's operation. First, the FBI's bare assertion that it was investigating domestic terrorism isn't enough to establish the magistrate judge's authority to issue an extra-district warrant. Rather, as the government concedes, a court "must evaluate the evidence proffered in the affidavit to determine" whether the activities under investigation fell within § 2331(5)'s definition of domestic terrorism.[2] Thus, the analysis turns on this Court's independent review of the sufficiency of the information that was—and was not—presented in the affidavit.[3]

Second, although the government asserts that the defense "incorrectly focuses on only the one offense for which [Morgan] is currently charged, rather than the larger investigation into his activities as a whole," it wrestles with a strawman.[4] The rule asks whether there was "an investigation of domestic terrorism," and whether "activities related to the terrorism may have occurred."[5] Because the term "activities" encompasses "criminal and non-criminal activities" (so long as the conduct was "related to" domestic terrorism), the defense agrees that the focus is on his activities as a whole.[6] And that's why the motion focused on the government's failure to prove that his *overall* activities

---

[2] R.34:7 (quoting *Matter of Search of One Apple Iphone Smartphone*, 628 F. Supp. 3d 155, 163 (D.D.C. 2022)).

[3] *One Apple Iphone Smartphone*, 628 F. Supp. 3d at 163.

[4] *See* R.34:8–12.

[5] Fed. R. Crim. P. 41(b)(3).

[6] *One Apple Iphone Smartphone*, 628 F. Supp. 3d at 162.

were related to domestic terrorism.[7] The defense didn't limit the inquiry to the charged crime (possession of the devices found in his trailer), but rather broadly analyzed the totality of his activities—including his online posts about the government and minorities, his prior possession of "homemade weapons," and his posts about those weapons.[8] Under Rule 41(b)(3)'s plain terms, those "activities" were fair game—and in the absence of sufficient proof that they were "related to" domestic terrorism, the Magistrate Judge in the Eastern District lacked jurisdiction to authorize a search in this district.[9]

With that throat clearing out of the way, the narrow question for the Court is whether the affidavit presented enough facts showing that Morgan's investigated activities were "related to" domestic terrorism, within the meaning of § 2331(5).[10] Again, the federal definition of "domestic terrorism" requires proof that the "activities":

- involved dangerous acts in violation of the law;

- "appear to be intended" to "intimidate or coerce a civilian population," to influence government policy "by intimidation or coercion," or to affect government conduct "by mass destruction, assassination, or kidnapping"; and

- primarily occurred within the jurisdiction of the United States.[11]

---

[7] R.23:4 ("[T]he affidavit is silent as to why there was any reason to believe that Morgan's activities were 'domestic terrorism'"); *id.* at 12 ("[N]o allegations in the warrant indicate that Morgan's activities were intended to intimidate or coerce either civilians or the government"); *id.* at 14 ("[I]f Morgan's activities didn't appear to be intended to further at least one of § 2331(5)(B)'s aims, his conduct may have been criminal—but not domestic terrorism").

[8] *See generally* R.23.

[9] Fed. R. Crim. P. 41(b)(3); *accord One Apple Iphone Smartphone*, 628 F. Supp. 3d at 163.

[10] Fed. R. Crim. P. 41(a)(2)(D), (b)(3).

[11] 18 U.S.C. § 2331(5)(A)–(C).

The defense concedes the first and third points.[12] Thus, the already narrow question grows narrower: whether the affidavit established that Morgan's activities were "related to" the apparent intent proscribed by § 2331(5)(B). The government argues that his activities satisfied the statute's three disjunctive intent elements but, as the following shows, it failed to meet that burden.[13] Because the bulk of its points speak to the second intent (an apparent intent to influence government policy through intimidation), this reply will start with the other two before tackling the main dispute: § 2331(5)(B)(ii).

**A. No proof of an intent to intimidate civilians.**

Beginning with § 2331(5)(B)(i), the government offers two reasons why Morgan's activities were apparently intended to intimidate civilians.[14] First, it relies on the "acid sprayer" he built in 2019, which he said was able to "chemically burn commies alive and melt their face off," and (as a "warning") had a "black and yellow color scheme" like a "wasp."[15] But Morgan didn't build or advertise the device to attack or cow a disfavored political group; rather, as he explained, he created it "to protect himself" after he had been "threatened by Antifa."[16] As the Supreme Court recognized in *Heller*, individual self-defense is the "central component" of the right to bear arms the Second Amendment codified.[17] Taking steps to assert that right, and intending to use a device for self-defense

---

[12] *Compare* R.34:13–15, 22 *with* R.23:14 ("Only one element of the statutory definition of domestic terrorism is at issue in this case—Morgan's motive and intent.").

[13] R.34:15–21.

[14] *Id.* at 19–20.

[15] *Id.* at 19.

[16] R.23-1:19 (¶¶ 18, 28).

[17] *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008).

(even a so-called acid thrower), is not a shorthand for or tantamount to an intent to inflict "violence and intimidation" in furtherance of a political aim.[18]

Second, the government argues that it established Morgan's intent to intimidate civilians through his online posts expressing racist, antisemitic, and nativist sentiments, because the posts connected his "racial motivations" to violence against those groups.[19] But there's no evidence establishing a nexus between those statements and any of his "activities" involving illegal "acts dangerous to human life."[20] The government's response spends almost three pages listing every activity he engaged in conceivably satisfying § 2331(5)(A) (namely, his possession of firearms, homemade weapons, and various chemicals). Yet nothing suggests, let alone establishes, the key point: that any of those activities were apparently intended to intimidate the groups that he expressed contempt for on social media. And absent a nexus, Morgan's beliefs and biases were not enough by themselves to show that his "activities under investigation [fell] within the § 2331(5) definition of 'domestic terrorism.'"[21] Again, ideology alone (no matter how repugnant) doesn't place conduct within § 2331(5) where it would otherwise fall outside the statute's ambit.[22] For obvious First Amendment reasons, proof of a dangerous crime coupled with proof of the suspect's biases doesn't mean that the FBI has a terrorism investigation on its hands, absent at least *some* connection between the two.

---

[18] *See United States v. Christianson*, 586 F.3d 532, 539 (7th Cir. 2009) (explaining that a terrorist is one who "use[s] violence and intimidation to further their views").

[19] R.34:19–20.

[20] 18 U.S.C. § 2331(5)(A).

[21] *See One Apple Iphone Smartphone*, 628 F. Supp. 3d at 163.

[22] *See* Sophia Brill, *What Is Domestic Terrorism and Why Does the Definition Matter?*, 71 DOJ J. FED. L. & PRAC. 22 (2023).

**B.  No proof of an intent to affect government conduct by mass destruction.**

Next, jumping to § 2331(5)(B)(iii), the government argues that Morgan's activities were apparently intended to "affect the conduct of the government by mass destruction."[23] That claim is based entirely on private messages Morgan sent to his girlfriend on Gab where he fantasized about how he would make and use chlorine gas if the "goobermint" came "for the guns."[24] But those statements can't be divorced from their context: Morgan wasn't a felon at the time and had every right to keep and bear the firearms found in his trailer. (Of course, that will shortly change following his plea). Thus, his private messages described a purported response to a government attempt to disarm him, in violation of his Second Amendment rights. Childish, hyperbolic speculation about his response to implausible government overreach wasn't equivalent to an intent to affect the government's conduct through mass destruction, any more than Charlton Heston's (in)famous line about prying a gun from his "cold, dead hands."

The government responds that "the fact that a plan was not borne out" does not negate Morgan's intent, given that "inchoate offenses" can still be domestic terrorism, but there was no inchoate offense here.[25] The case it relies on, *Elshinawy,* involved a conspiracy to provide material support to ISIS where the defendant worked "towards accomplishing" his "plan of attack."[26] As the *Elshinawy* Court recognized, conspiracies definitionally "do not require that all objects of the conspiracy be accomplished."[27] But

---

[23] R.34:21 (quoting § 2331(5)(B)(ii)).
[24] R.23-1:18–19 (¶ 26).
[25] R.34:21 (citation omitted).
[26] *United States v. Elshinawy*, No. ELH-16-009, 2018 WL 1521876 at *24 (D. Maryland Mar. 28, 2018).
[27] *Id.* (quoting *United States v. Abu Ali*, 528 F.3d 210, 264 (4th Cir. 2008)).

they *do* require an intent to commit the agreed-upon object of the conspiracy.[28] That intent was found in *Elshinaway*, yet it is absent here: Morgan's private puffery to his girlfriend did not establish an inchoate intent to affect government conduct by mass destruction.

### C.    No proof of an intent to influence the government by intimidation.

Finally, turning to § 2331(5)(B)(ii), the bulk of the government's response focuses on whether there was enough proof that Morgan intended to influence government policy through intimidation.[29] The government relies on his statements, but it wrenches them from their context and fails to link them to an apparent intent to influence policy. Like his racial animus, Morgan's disdain for the government jumps off the page—but it's not proof of an intent to influence the government through violence, and the absence of that proof establishes Rule 41(b)(3)'s inapplicability here.

First, the government relies on a post where Morgan announced forming his "own militia."[30] He intended to "defend" our "God given freedoms" that were being lost (due to government policies he opposed); he stated that "we need to dust off our guns and do this again"; and he asked "[w]ho will answer this call to arms?"[31] But the government mistakenly conflates a "call to arms" with a "call to violence."[32] It's legal to form a militia, and it's legal for militia members to keep and bear arms. Indeed, the necessity of a "well regulated [m]ilitia" is codified in the Second Amendment's prefatory clause, reflecting

---

[28] *E.g., United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.20 (1978).
[29] R.34:16–18.
[30] *Id.* at 16.
[31] *Id.*
[32] *Id.*

the Founders' view that militias were "the natural defence of a free country."[33] And a militia's lawfulness doesn't change just because it opposes government conduct or policy; applying such viewpoint discrimination to activity shielded by the Second Amendment would be blatantly unconstitutional.[34] Rather, the line is crossed only where militiamen threaten or use "violence and intimidation to further their views."[35] Because Morgan's post didn't call for the use of force to change government policy through intimidation or coercion, it didn't satisfy § 2331(5)(B)(ii).

Relatedly, the government points to a post where Morgan discussed selling "affordable artillery" to "the common man" by "get[ting] around" the laws regulating "destructive devices."[36] The post likely satisfied § 2331(5)(A)—building artillery is a dangerous and illegal activity—but it never connected that activity to an intent to influence policy, as required by § 2331(5)(B)(ii). Although the government asserts that it was "consistent with" his prior militia post, the artillery post didn't speak to the government, its policies, or rousing people to violence against those policies.[37] Thus, it wasn't evidence of an intent to influence the government by intimidation.

The government also argues that Morgan's reason for building the acid gun (because governments should "fear" their people), and his messages to his girlfriend

---

[33] U.S. Const. amend. II; *Heller*, 554 U.S. at 597 (quoting J. Story, *Commentaries on the Constitution*, 3 § 1890)).

[34] *E.g., Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (explaining that viewpoint-based discrimination is "an egregious form of content discrimination" that "blatant[ly]" violates the First Amendment).

[35] *See Christianson*, 586 F.3d at 539.

[36] R.23-1:26 (¶ 46).

[37] *See id.*

about using chlorine gas if law enforcement tried to seize his guns, showed a "plan[] to intimidate the government."[38] The reasons discussed above showing why those messages aren't within § 2331(5)(B)(iii) apply here too, but there's an additional textual reason showing why they didn't satisfy § 2331(5)(B)(ii): the question isn't whether there was an apparent intent "to intimidate the government," but rather an intent "to influence *the policy*" of the government.[39] These statements had nothing to do with influencing policy; thus, they did not establish apparent intent under § 2331(5)(B)(ii).

Finally, the government cites to a post where Morgan wrote that violence is "an answer," as shown by how "they use violence themselves to solve their problems."[40] But the government once again downplays the context: Morgan prefaced the post by saying he was "not telling anyone to do anything."[41]  Because he wasn't advocating for violence against the government (let alone violence to achieve political ends or influence policy), but rather making a point about hypocrisy, this statement likewise fails to shoulder the government's burden of proving that his activities were apparently intended to influence government policy through intimidation or coercion.

In short, Morgan's activities were troubling and his words were disturbing—but domestic terrorism requires more. The government had to prove that his activities were "related to" domestic terrorism, and show that he apparently intended to intimidate civilians, influence government policy, or affect government conduct. Because such proof

---

[38] R.34:17.
[39] 18 U.S.C. § 2331(5)(B)(ii) (emphasis added).
[40] R.34:17; *see also* R.23-1:30 (¶ 52).
[41] R.23-1:30 (¶ 52).

is lacking here, the warrant did not satisfy Rule 41(b)(3)'s demands and could not issue. As the following will show, there is only one remedy for that violation: suppression.

## II.     The remedy for violating Rule 41(b)(3) is suppression.

The government argues that even if the warrant violated Rule 41(b)(3), suppression is unjustified because "violations of federal rules do not justify the exclusion of evidence."[42] But the Seventh Circuit cases it relies on are inapposite: each dealt with procedural and technical rule violations that went beyond the Constitution's demands, and thus did not implicate the Fourth Amendment's core requirements. Because the violation here—the lack of jurisdiction—is constitutional and rendered the warrant void *ab initio*, the traditional exclusionary rule applies.

To restate the controlling first principle, Rule 41 violations take two forms: "those involving constitutional violations, and all others."[43] Again, technical rule violations, which "go beyond the Constitution's demands," do not demand exclusion.[44] Consistent with that principle, the Seventh Circuit cases the government cites involved technical Rule 41 violations (or no violation at all). For instance, in *Trost*, the Court addressed violations of Rule 41(d) (because the warrant wasn't returned promptly), and Rule 41(a) (because its execution took place without a federal official).[45] Then, in *Cazares-Olivas*, the Court found a Rule 41(e) violation where an impartial magistrate judge found probable

---

[42] *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008) (quoting *United States v. Cazares-Olivas*, 515 F.3d 726, 730 (7th Cir. 2008)).

[43] *United States v. Simons*, 206 F.3d 392, 403 (4th Cir. 2000); *accord United States v. Chaar*, 137 F.3d 359, 362 (6th Cir. 1998); *United States v. Gerber*, 994 F.2d 1556, 1560 (11th Cir. 1993).

[44] *Cazares-Olivas*, 515 F.3d at 730 (parenthetical citation omitted).

[45] *United States v. Trost*, 152 F.3d 715, 721 (7th Cir. 1998).

cause and telephonically authorized a search, but "[t]he agents did not prepare and read to the judge a 'proposed duplicate original warrant'" and the judge "did not prepare and sign an original warrant."[46] And finally in *Berkos*, the Court found that a warrant issued under 18 U.S.C. § 2703(a) didn't even violate Rule 41(b).[47] In each case, the evidence was seized "on the basis of probable cause, and with advance judicial approval" by a magistrate judge with jurisdiction to allow the search.[48] Because the Fourth Amendment asks for no more, suppression would have been "a remedy wildly out of proportion to the wrong."[49] Put simply, there's no constitutional right to a warrant's prompt return, so that kind of technical error doesn't trigger the exclusionary rule.

But Rule 41 violations of constitutional import are a different beast: where "the violation is 'constitutional'—i.e., a violation of the Fourth Amendment—then suppression is governed by the exclusionary rule standards applicable to Fourth Amendment violations generally."[50] As one court put it, Rule 41 violations resulting in "clear constitutional violations" are errors that "require suppression."[51] That makes sense: a constitutional violation isn't immunized from suppression just because the federal rules codified a specific Fourth Amendment requirement.

---

[46] *Cazares-Olivas*, 515 F.3d at 730; *see also* Fed. R. Crim. P. 41(e)(3)(A) (2007).

[47] 543 F.3d at 398. Importantly, whether the exclusionary rule applies to Rule 41(b) violations wasn't addressed by the holding in *Berkos* because the government had forfeited that particular argument. *See id.* at 396.

[48] *Cazares-Olivas*, 515 F.3d at 730.

[49] *Id.*

[50] *United States v. Werdene*, 883 F.3d 204 (3d Cir. 2018).

[51] *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1283 (9th Cir. 1992).

Here, the error was jurisdictional and therefore constitutional. "[J]urisdiction is squarely in play" whenever Rule 41(b) is violated; in the government's own words, Rule 41(b) "ensures that the magistrate judge has jurisdiction."[52] That's because, under the Federal Magistrates Act, a magistrate judge's power is conferred solely "by law or by the Rules of Criminal Procedure"; thus, when a judge issues a warrant "outside of Rule 41(b)'s ambit, she necessarily transgresse[s] the limits of her jurisdiction."[53] In short, the Act "is the sole source of a magistrate judge's warrant authority," and "a warrant issued in defiance of its jurisdictional limitations is void—'no warrant at all.'"[54] That, in turn, shows why the error here was constitutional: "[u]nder a historical understanding of the Fourth Amendment, the jurisdiction of the issuing judge . . . is limited, and a warrant is not valid if an officer acts outside of that limited jurisdiction."[55]

Tellingly, the government doesn't contest that a warrant issued without jurisdiction is unconstitutional and void *ab initio*, nor does it deny that the exclusionary rule applies to a void warrant.[56]  Rather, it notes that the "Seventh Circuit has held that the good faith exception applies to search warrants issued for property outside of a magistrate judge's jurisdiction."[57] As the *Kienast* Court observed, even if a violation of

---

[52] *United States v. Taylor*, 935 F.3d 1279, 1287 (11th Cir. 2019) (first quote); R.34:11 (second quote).

[53]  28 U.S.C. § 636(a)(1) (first quote); *Taylor*, 935 F.3d at 1287 (second quote) (emphasis omitted).

[54] *Taylor*, 935 F.3d at 1287 (quoting *United States v. Krueger*, 809 F.3d 1109, 1118 (10th Cir. 2015) (Gorsuch, J., concurring)).

[55] *Engleman v. Deputy Murray*, 546 F.3d 944, 948–49 (8th Cir. 2008); *accord Krueger*, 809 F.3d at 1124 (Gorsuch, J., concurring); *Werdene*, 883 F.3d at 207.

[56]  *See generally* R.34; *see also Werdene*, 883 F.3d at 207 (explaining that a violation of the jurisdictional provisions in Rule 41(b) renders a warrant void *ab initio* and triggers the exclusionary rule).

[57] R.34:25 (citing *United States v. Grisanti*, 943 F.3d 1044, 1050 (7th Cir. 2019)).

Rule 41(b)(4) rendered a warrant void *ab initio*, the error would be treated "like any other constitutional violation," subject to the good faith exception.[58] And that position is shared by every circuit court to have considered a warrant void for lack of jurisdiction.[59]

The universal understanding that the good faith exception applies to a void warrant refutes the notion that a Rule 41(b) violation isn't subject to suppression. After all, *Kienast* (and every other circuit) wouldn't have had to address the question of good faith unless the exclusionary rule applied to a Rule 41(b) violation. Put differently, good faith is only in play if suppression is on the table—to discuss an exception to the exclusionary rule presupposes the rule's applicability. In short, absent a showing of good faith, suppression is the appropriate remedy for a Rule 41(b) violation.

### III.   The material omissions in the warrant violated *Franks*.

Before turning to the question of good faith, there is an additional basis for suppression: the affiant's violation of *Franks* by omitting materials facts further showing that Morgan's investigated activities didn't meet the definition of domestic terrorism. Although Magistrate Judge Crocker has already ruled that a *Franks* hearing is unnecessary, the defense responds to both the government's arguments and that ruling to flesh out the record and preserve the issue.[60] As the following will show, the defense has satisfied *Franks*'s three prongs, and so an evidentiary hearing is necessary.

---

[58] *United States v. Kienast*, 907 F.3d 522 (7th Cir. 2018).
[59] *Grisanti*, 943 F.3d at 1049 (collecting cases).
[60] R.27.

First, as to materiality, the government argues that the omissions were immaterial because the affiant didn't have to prove that Morgan was likely to commit terrorism, and so his dangerousness wasn't "central" to the probable cause finding.[61] This assertion is both correct and irrelevant. Whether a misrepresentation or omission vitiated the probable cause finding is *typically* the ultimate issue in the run-of-the-mill *Franks* claim.[62] But the Seventh Circuit has also analyzed warrants for bad faith where the omissions went not to the probable cause finding, but rather to the magistrate judge's jurisdiction under Rule 41(b).[63] And that's the analytic framework applicable here.

As to that jurisdictional question, the government asserts that the omissions were immaterial because it only had to prove that the warrant was sought in a domestic terrorism investigation.[64] As explained above in Part I, and as mandated by Rule 41(b)(3)'s terms, the government had to prove that Morgan's activities were "related to" domestic terrorism.[65] Again, that burden required the affidavit to have "sufficient facts" showing that "the investigated activities fell within the § 2331(5) definition of 'domestic terrorism.'"[66] That standard required proof not only of dangerous and illegal activities, but also of an apparent intent to intimidate or coerce civilians or the government.[67] At risk of understatement, the opinions over the years from Morgan's family, coworkers, state law enforcement, and the FBI itself that he "wasn't an actual threat to anybody,"

---

[61] R.25:3–4.
[62] *See, e.g., United States v. Daniels*, 906 F.3d 673, 676 (7th Cir. 2018).
[63] *See Grisanti*, 943 F.3d at 1050.
[64] R.25:4–5.
[65] Fed. R. Crim. P. 41(b)(3).
[66] *One Apple Iphone Smartphone*, 628 F. Supp. 3d at 163.
[67] 18 U.S.C. § 2331(5)(B).

was "harmless," had made "no specific threats," was not "an imminent, specific threat," and posed no "threat to life" shed light on his apparent intent (or the lack thereof).[68] And those material statements should've been presented to the issuing judge.

Next, as to *Franks*'s second prong (whether the omissions were intentionally or recklessly made), the government argues that the affidavit's context precludes finding an intent to mislead.[69] This is so, it posits, because the omitted statements "were undermined" by other information the FBI had subsequently gathered, like Morgan's November 2023 post "about violence being an answer."[70] But that's precisely *why* the omissions suggest, at the very least, a reckless disregard for the truth. The FBI possessed some information that was relevant to his intent that made him look dangerous, and it possessed other information relevant to his intent suggesting that he wasn't a threat. In conveying the bad and omitting the good, the affidavit put a thumb on the scale and undercut the issuing court's ability to independently assess whether the government had actually satisfied Rule 41(b)(3). And that was sufficient to "support (though not require) a reasonable inference that" the omissions were at least recklessly made.[71]

Relatedly, in denying an evidentiary hearing, Magistrate Judge Crocker observed that if the affiant had concerns about satisfying Rule 41(b)(3), he would've simply sought a warrant in this district rather than try to mislead Magistrate Judge Dries. Perhaps that innocent explanation is correct and the reckless disregard proscribed by *Franks* is lacking.

---

[68] *See* R.23-2 through R.23-8.
[69] R.26:1–2.
[70] *Id.* at 2.
[71] *See United States v. McMurtrey*, 704 F.3d 502, 505 (7th Cir. 2013).

But "to obtain a *Franks* hearing, the defendant need not overcome the court's speculation regarding an innocent explanation" for the omission.[72] Because the importance of the omitted information to the jurisdictional question provides "sufficient circumstantial evidence to support a reasonable" inference of "reckless disregard for the truth," a *Franks* hearing remains necessary to explore the affiant's intent.[73]

Finally, as to the third prong of the *Franks* analysis (whether the omissions were necessary to the warrant's issuance) the government briefly argues that "even if all of the omitted information were included," it wouldn't have "alter[ed] Morgan's own statements about his intentions."[74] As explained above in Part I, those statements were not enough to satisfy the government's Rule 41(b)(3) obligation of proving this was a domestic terrorism investigation.[75] But to the extent there is lingering doubt about whether the affidavit had enough facts to meet the government's jurisdictional burden, the FBI's failure to prove that his activities were apparently intended to intimidate or coerce civilians or the government is laid bare by the FBI's repeated conclusions (spanning *years*) that Morgan posed no "threat to life."

In sum, the information about Morgan's lack of danger was material to the jurisdictional question, the defense made a threshold showing that it was recklessly omitted, and the omission was necessary to the jurisdictional determination that his activities were related to domestic terrorism. Because the defense met its burden of

---

[72] *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014).

[73] *See id.*

[74] R.25:6.

[75] *See* Part I, *supra.*

production under *Franks*, the Court should hold an evidentiary hearing, and conclude that the reckless omissions provide a further basis for excluding the search's fruits.

### IV.    The good faith exception is inapplicable.

The government argues that even if a Rule 41(b)(3) violation occurred and the exclusionary rule applies, suppression is unnecessary because the FBI acted in good faith in obtaining and executing the warrant.[76] But the good faith exception is inapplicable, and the Supreme Court has held that the decision to get a warrant doesn't reflexively equate to law enforcement's good faith in executing it.[77] The *Leon* Court was clear: it wasn't categorically holding "that exclusion is always inappropriate in cases where an officer has obtained a warrant and abided by its terms."[78] Rather, the Court articulated several situations where suppression "remains an appropriate remedy," two of which are relevant here:

- where the court was misled by intentional or reckless or omissions; and

- where the warrant is "so facially deficient" that "the executing officers cannot reasonably presume it to be valid."[79]

As to the first scenario, it overlaps with the *Franks* analysis—the question is whether the affiant misled the issuing judge through material omissions made either intentionally or recklessly.[80] Although this carveout to *Leon* usually focuses on

---

[76] R.34:25–27.

[77] *United States v. Leon*, 468 U.S. 897, 914 (1984).

[78] *Id.* at 921.

[79] *Id.* at 923.

[80] *Id.* (citing *Franks*, 438 U.S. at 154); *see also, e.g., United States v. Woolsey*, 535 F.3d 540, 547 (7th Cir. 2008) (explaining, in the context of *Leon*, that "[b]ecause material omissions can be equally deceptive," a defendant may "challenge an affidavit by showing that the affiant intentionally or recklessly omitted material information").

whether the omitted information "was essential to the finding of probable cause," it also applies to misrepresentations relevant to both the warrant's "geographic limits" and the magistrate judge's territorial jurisdiction under Rule 41(b).[81] Again, as explained above in Part III, the affidavit violated *Franks* by recklessly omitting information about Morgan's lack of dangerousness, including the (repeated) conclusions from law enforcement that he wasn't a specific, imminent threat posing a risk to life.[82] That, in turn, further established the government's failure to prove that this was a domestic terrorism investigation, as mandated by Rule 41(b)(3)'s demand. Those reckless omissions not only provide an independent basis for suppression, but also show why the good faith exception is inapplicable.

*Leon*'s second circumstance applies here too: the warrant was "so facially deficient" that that FBI couldn't have reasonably presumed it valid.[83] The affidavit made no explicit argument that this was a domestic terrorism investigation, and it contained insufficient proof supporting the conclusion that Morgan's investigated activities fell within § 2331(5)'s definition of domestic terrorism.[84] Again, as explained at length in Part I of this reply, the affidavit was devoid of proof that he apparently intended to intimidate civilians, or affect government policy or conduct through intimidation, as required by § 2331(5)(B).[85] Because the affidavit's failure to grapple

---

[81] *Woolsey*, 535 F.3d at 547 (first quote); *Grisanti*, 943 F.3d at 1050–51 (second quote).

[82] *See* Part III, *supra*.

[83] *Leon*, 468 U.S. at 923 (internal quotations omitted).

[84] *See One Apple Iphone Smartphone*, 628 F. Supp. 3d at 163.

[85] *See* Part I, *supra*.

with Rule 41(b)(3)'s terms is immediately apparent, no reasonable agent could have presumed it valid given the jurisdictional defect.

In *Kienast*, the Seventh Circuit concluded that the extra-district search warrant in that case was not so facially deficient to the point of precluding good faith reliance, but that was because the warrant's validity posed "difficult conceptual questions."[86] Specifically, there was a plausible argument that the warrant was allowed under Rule 41(b)(4), and "many district judges" had differed on that question.[87] Critically, the *Kienast* Court didn't issue a one-size-fits-all holding; as the Supreme Court has recognized, whether a warrant is too facially deficient to support good-faith reliance "depend[s] on the circumstances of the particular case."[88] As to the particular issue here—whether the warrant satisfied Rule 41(b)(3)—there is no nationwide split amongst the district courts as to that rule's operation. Rather, the existing persuasive authority in effect at the time of the search (the decision in *One Apple Iphone Smartphone*) emphasizes that a judge "cannot simply take the affiant at her word" in determining whether the investigated activities were domestic terrorism.[89] Unlike the situation in *Kienast*, there is no difficult conceptual question or split in opinion justifying the FBI's reliance on a facially deficient warrant.

---

[86] 907 F.3d at 528–29.

[87] *Id.*

[88] *Leon*, 468 U.S. at 923.

[89] 628 F. Supp. 3d at 163.

In sum, the exclusionary rule's purpose is deterring police misconduct.[90] That concept not only includes deliberate acts, but also reaches "'grossly negligent' disregard for Fourth Amendment rights."[91] Where gross negligence has occurred, "the deterrent value of exclusion is strong and tends to outweigh the resulting costs."[92] Put differently, "making the magistrate the sole protector" of the Fourth Amendment is untenable because it "encourages sloppy police work."[93] Here, exclusion furthers the goal of deterring reckless omissions and grossly negligent police work. The omissions identified above should have been included, and no reasonable agent could've relied on this facially deficient warrant. Because exclusion would encourage greater care in drafting affidavits and complying with Rule 41(b)'s jurisdictional limits, suppression is appropriate.

### V.     The inevitable discovery doctrine is inapplicable.

Finally, the government briefly argues that inevitable discovery applies, given that "a separate warrant for the trailer" in this district "*could have* readily been obtained using the same facts in the Eastern District affidavit."[94] But "could have" isn't the applicable legal standard. Under Circuit precedent, inevitable discovery applies if the government proves "a warrant would certainly, and not merely probably, have been issued had it been applied for."[95] Certitude is the key: in the *Tejada* Court's words, the exception has a

---

[90] *Leon*, 468 U.S. at 914.
[91] *Davis v. United States*, 564 U.S. 229, 238 (2011) (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)).
[92] *Id.*
[93] *See Briggs v. Malley*, 748 F.2d 715, 720 (1st Cir. 1984).
[94] R.34:27 (emphasis added).
[95] *United States v. Tejada*, 524 F.3d 809, 813 (7th Cir. 2008).

"requirement of sureness" approaching "certainty."[96] Put slightly differently, there must be proof that "the officers inevitably would have sought the warrant and conducted a lawful search."[97] Here, the government has not argued, let alone proved, that as a matter of certainty a warrant *would have* been applied for and *would have* issued in this district. Having failed to argue and establish that (beyond "the shadow of a doubt") a warrant would have issued, the government has not met its burden of showing that the evidence would have inevitably been discovered.[98]

## VI.    Conclusion

There are many things to dislike like about Morgan's activities and beliefs. His devices were dangerous, and most of his political views were offensive. But those things alone weren't enough to make it reasonable to believe that the FBI had a domestic terrorist on their hands. There was no nexus between his activities and beliefs, and no proof that his actions were apparently intended to intimidate or coerce. And that failure of proof is underscored by the affidavit's omissions (in violation of *Franks*) of the FBI's longstanding conclusion that he posed no threat to life. Because the extra-district warrant was facially void, its tainted fruits should be suppressed.

---

[96] *Id.*
[97] *United States v. Rosario*, 5 F.4th 706, 713–14 (7th Cir. 2021).
[98] *See Tejada*, 524 F.3d at 813.

Dated at Madison, Wisconsin, this 9th day of April, 2024.

Respectfully submitted,

James Morgan, Defendant

*/s/ Jonathan Greenberg*
Jonathan Greenberg
Joseph A. Bugni
FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
jonathan_greenberg@fd.org