## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

                       Plaintiff,

    v.

JAMES MORGAN,

                       Defendant.

REPORT AND
RECOMMENDATION

24-cr-6-jdp

---

### REPORT

The grand jury returned a one-count indictment against defendant James Morgan, charging him with unlawfully possessing destructive devices (homemade shrapnel grenades) not registered to him in the National Firearms Registration and Transfer Record. Dkt. 10. Morgan has filed a motion to dismiss the indictment (dkt. 22) and a motion to suppress evidence seized in this district pursuant to a search warrant issued in the Eastern District of Wisconsin (dkt. 23).

In support of his dismissal motion, Morgan contends that the charging statute is an unconstitutional extension of Congress's taxing power. (Dkt. 22). In support of his motion to suppress, Morgan contends that this was not a qualifying investigation of domestic terrorism that would have permitted inter-district execution of the warrant pursuant to F.R. Crim. Pro. 41(b)(3). Morgan requested a *Franks* hearing,[1] contending that the search warrant affiant intentionally or recklessly omitted facts from his affidavit that would have established the inapplicability of Rule 41(b)(3). The government opposes both motions and has objected to holding a *Franks* hearing.

I have declined to hold a *Franks* hearing (*see* February 21, 2024 text-only order, dkt. 27). and I am recommending that the court deny both motions.

---

[1] *Franks v. Delaware,* 438 U.S. 154 (1978)

**Dkt. 22: Motion To Dismiss the Indictment**

Morgan is charged with violating 26 U.S.C. § 5861(d) of the National Firearms Act (NFA), which is part of the federal tax code. Morgan contends that § 5861 is unconstitutional because its prohibitions and penalties exceed Congress's taxing power. Dkt. 22 at 1. The government disagrees, citing Supreme Court and Seventh Circuit precedent that have found § 5681 constitutional. Dkt. 33 at 8. In reply, Morgan is left to argue that, given how the Supreme Court has analyzed tax statutes in other types of cases, "the NFA's constitutional basis must be reexamined." Dkt. 41 at 4. Even if this were so–and there is good reason to doubt that it is–"in a hierarchical system, decisions of a superior court are authoritative on inferior courts. Just as the court of appeals must follow decisions of the Supreme Court whether or not we agree with them, . . . so district judges must follow the decisions of this court whether or not they agree." *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004); *see also Burke v. Amedisys,* ___ F. Supp.3d ___, 2022 WL 3226797 at *13 (N.D. Ill., Aug. 10, 2022) ("when it comes to updating Seventh Circuit case law, the Seventh Circuit is in the driver's seat."). Current, binding precedent dooms Morgan's motion to dismiss.

In 1934, Congress enacted the NFA, 26 U.S.C. § 5801 *et seq.* The NFA imposes a federal tax on the manufacture, sale and transfer of "firearms," which the NFA defines as short-barreled shotguns and rifles, machine guns, silencers, and "destructive devices," such as bombs, grenades, rockets, missiles and mines. *See* § 5845. The NFA quickly was challenged as a pretext to regulate certain firearms that otherwise could not be regulated. In 1937, the Supreme Court upheld the NFA as a valid exercise of Congress's taxing power. *Sonzinsky v. United States*, 300 U.S. 506 (1937). The Court found that the NFA "on its face . . . is only a taxing measure" that "contains no regulation other than the mere registration provisions, which are obviously

supportable as in aid of a revenue purpose." *Id.* at 513.  The NFA's regulatory provisions did not

amount to a penalty resorted to as a means of enforcing the regulations, and it did not treat the

subject of the tax as criminal.  Noting that the annual tax was "productive of some revenue" the

Court stated that "we are not free to speculate as to the motives which moved Congress to

impose it, or as to the extent to which it may operate to restrict the activities taxed." *Id.* at 514.

As the government points out in its opposition brief, all nine federal circuit courts that

have addressed subsequent challenges to the NFA have upheld the Act as constitutional.  *See* dkt.

33 at 3.  The Seventh Circuit has done so twice, first in *United States v. Copus*, 93 F.3d 269, 276

(7th Cir. 1996), a case out of this court involving a silencer and an IED, then in *United States v.*

*Lim*, 444 F.3d 910 (7th Cir. 2006), another case out of this court involving a sawed-off shotgun.

The court rejected Lim's argument that § 5861(d) exceeded Congress's taxing power because the

purpose of the statute is not to tax, but instead to prohibit the possession of certain firearms:

> Congress under the taxing power may reasonably impose a penalty
> on possession of an unregistered firearm . . . Attaching criminal
> consequences to the possession of an unregistered weapon is thus
> a rational way of discouraging the transfer of untaxed firearms.
> Section 5861(d) in this way encourages registration and reinforces
> the revenue-generating purpose of the Act.  This is a constitutional
> exercise of Congress's taxing power.

*United States v. Lim*, 444 F.3d at 913.

The courts in *Copus* and in *Lim* both distinguished *United States v. Dalton*, 960 F.2d 121

(10th Cir. 1992) in which the court found §5861(d) unconstitutional because it taxed machine

guns, which no longer could be legally owned pursuant to 18 U.S.C.§922(o).  Copus was not

faced with any ban on the outright possession of silencers or making IEDs, 93 F.3d at 276;

similarly  Lim faced no such Catch-22 because he could legally own a sawed-off shotgun as long as he paid the required tax.  444 F.3d at 913-14.[2]

Morgan replies that none of the precedent cited by the government applies to his motion because none of them addressed the Court's reasoning in *Dep't of Revenue of Mont. v. Kurth Ranch*, 511 U.S. 767 (1994) and *Nat'l Fed. of Ind. Bus. v . Sebelius*, 567 U.S. 519 (2012).  According to Morgan, "the NFA is no longer justifiable as an exercise of the taxing power since the factual underpinnings of *Sonzinsky* have eroded away."  Dkt. 41 at 3.

Relying primarily on *Kurth* and *Sebelius* (which relied heavily *Child Labor Tax Case*, 259 U.S. 20 (1922)), Morgan argues that (1) the NFA's  "tax" is not administered by the IRS, but by the USDOJ, which has displaced the Treasury Department as the NFA's sole enforcer; (2) the penalty for violating the NFA is grossly disproportionate to what is normally lodged against a tax violation; and (3) today, as opposed to when the Court upheld the NFA in *Sonzinsky*, "the law is designed to prevent payment of the tax in as many instances as possible. Yet real taxers do not operated in this fashion."  Dkt. 41 at 6.  According to Morgan, the NFA "is not the same 'tax' as the one the Supreme Court upheld almost a century ago."  Over time, the NFA has transmogrified into "a pure regulation, wrapped in the guise of a tax."  Dkt. 41 at 7.

But as the government points out, *Kurth Ranch* was decided before the Seventh Circuit decided either *Copus* or *Lim*, yet neither of these decisions by the Seventh Circuit invoked *Kurth Ranch* as authority to find the NFA unconstitutional.  To the same effect, after deciding *Sebelius*, the Supreme Court has twice denied petitions for certiorari where one of the issues raised was

---

[2] In *United States v. Ross*, 9 F.3d 1182 (7th Cir. 1993), the Seventh Circuit already had upheld § 5861(d) against a similar constitutional challenge in a machine gun case, finding that the defendant's purported dilemma was avoidable by not possessing a machine gun in the first place.  Interestingly, Judge Rovner, who wrote the *Lim* opinion, also was on the panel in *Ross*.

whether § 5861 was within Congress's taxing authority.  *See United States v. Bolatete*, 977 F.3d 1022 (11th Cir. 2020), *cert. denied*, ___ U.S. ___, 141 S.Ct. 1754 (2021); *United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018), *cert. denied*, ___ U.S. ___ 139 S.Ct. 2690 (2019).

In *Bolatete*, an undercover detective sold a silencer to the defendant.  Upon being charged under §5861(d), Bolatete moved to dismiss, contending that the NFA exceeded Congress's power to tax.  977 F.3d at 1030.  Bolatete raised the same arguments advanced by Morgan in the instant case; the court rejected them, based on its own precedent. *See* 977 F.3d at 1031-34. The court's only reference to *Sebelius* was favorable  to upholding the NSA.  *Id.* at 1032 ("Taxes that seek to influence conduct are nothing new.")

In *Cox*, the two defendants were charged under § 5861(d) with manufacturing and selling unregistered silencers, among other things.  In challenging the constitutionality of the statute, they raised the same arguments Morgan raises here, similarly contending that in the eight decades since the *Sonzinsky* opinion, the statute "has morphed . . . to the point that the current NFA registration system bears virtually no resemblance to a measure designed to collect revenue." 906 F.3d at 1180.  The court disagreed, distinguishing the *Child Labor Tax* case (on which Morgan also is relying) while noting that "only six years ago, *Sebelius* reaffirmed the NFA's constitutional legitimacy." *Id.* at 1181, citing *Sebelius*, 567 U.S. at 567.

If, as Morgan posits, the NFA actually is in need of reexamination, then one would have expected the Supreme Court to have granted certiorari in either *Bolatete* or *Cox*.  But it didn't. The most logical inference to draw from this is that *Sonzinsky* remains good law, and the NSA remains a valid exercise of Congress's power to tax.  That is the current law of this circuit, which this district court is obliged to follow.  Therefore, I am recommending that the court deny Morgan's motion to dismiss the indictment.

## Dkt. 23: Motion To Suppress Evidence

On December 19, 2023, the FBI applied to Magistrate Judge Stephen Dries in the Eastern District of Wisconsin for a warrant to search the person of James Morgan, his pickup truck, his travel trailer, and his rented storage locker in Whitewater, Wisconsin. The applicant/affiant was Special Agent Justin Mosiman. The FBI was looking for evidence of violations of statutes prohibiting the making or use of destructive devices, chemical weapons, and weapons of mass destruction: 18 U.S.C. § 842(p) ("teaching or demonstrating the making or use of weapons of mass destruction"); § 229(a)("develop, produce, possess, or conspire to use chemical weapon"); and §5861 ("receive, possess, or make firearm or destructive device").

Agent Mosiman cited F.R. Crim. Pro. 41(b)(3) to seek permission to search Morgan, his truck and his trailer even if they were located outside the Eastern District. *See* dkt. 23-1 at 12, ¶6. Rule 41(b)(3) allows such searches in an investigation of domestic terrorism. Judge Dries granted the request and issued an extraterritorial warrant. Agents found Morgan and his trailer in Janesville, which is in the Western District of Wisconsin. A safe in the trailer contained six homemade shrapnel grenades (*see* dkt. 1 at 3-4), which form the basis of the charge against Morgan in this district under 26 U.S.C. § 5861(d).

Morgan seeks to suppress this evidence, contending that the warrant was invalid for lack of jurisdiction in the Western District because Rule 41(b)(3)'s domestic terrorism extension of venue was inapplicable to this search. Further, contends Morgan, Agent Mosiman recklessly or intentionally omitted material information from his affidavit that would have shown that Rule 41(b)(3) did not apply to Morgan.

As noted at the outset, I am recommending that the court deny Morgan's motion. First, I conclude that Rule 41(b)(3) does authorize the challenged search, even when considering all

of the omitted facts cited by Morgan.  Second, I conclude that even if the Rule 41(b)(3) was not properly applied to this search warrant, this court should not apply the exclusionary rule to this mistake.

## FACTS

### I.  The Search Warrant Affidavit

Morgan has submitted a copy of Agent Mosiman's application and supporting affidavit. *See* dkt. 23-1.  In this case, the affidavit does *not* speak clearly for itself when considering the nature of Morgan's challenge. To guide the analysis, I am synopsizing Agent Mosiman's affidavit in detail and adding all of the omitted facts that Morgan contends were material to Judge Dries's decision to allow extraterritorial execution of this warrant:

#### (A) General Information in the Affidavit

Prior to joining the FBI, Agent Mosiman served in the U.S. Navy for six years as an Explosive Ordnance Disposal Technician and he provided contract support as an Explosive Ordnance Disposal Subject Matter Expert to DOD and DOE for twelve years collectively.  Agent Mosiman joined the FBI as special agent in 2019 and became an FBI bomb technician in February 2021.  At the time he applied for the search warrant in this case, Mosiman was assigned to the Joint Terrorism Task Force in Milwaukee, investigating matters related to counter terrorism and domestic terrorism.  In his warrant application, Agent Mosiman states that this search was related to the FBI's open investigation of violations of 18 U.S.C. § 842(p) ("teaching or demonstrating the making or use of weapons of mass destruction"); § 229(a) ("develop, produce, possess, or conspire to use chemical weapon"); and § 5861 ("receive, possess, or make firearm or destructive device").  Dkt. 23-1 at 10.

7

In his affidavit, Agent Mosiman opines that the facts provide probable cause of conspiracy in violation of 18 U.S.C. § 371 and communication of threats in violation of 18 U.S.C. § 875(c). *Id.* at 12. Agent Mosiman cites F.R. Crim. Pro. 41(b)(3) to seek permission to search Morgan, his truck and his trailer even if they are located outside the Eastern District, characterizing this as a domestic terrorism investigation. Dkt. 23-1 at 12, ¶ 6.

The probable cause section of Agent Mosiman's affidavit consists of 62 paragraphs and 22 photographs/screenshots.[3] In the affidavit, Agent Mosiman refers to Morgan both as Karactus Blome, which was Morgan's given name, then as James Morgan following Blome's legal name change in December of 2022. Aff. at 2, n.1. For simplicity's sake, I will refer to Morgan as "Morgan" throughout this report regardless how Agent Mosiman and others refer to him in the affidavit or their reports. Just keep in mind that in the affidavit itself, "Blome" = "Morgan."

**(B) James Morgan's Background**

Agent Mosiman reports that at the time of the warrant application in December 2023, Morgan was 30 years old. In August 2019 Morgan moved into his father's residence in Janesville. That November, Morgan began working on the assembly line at Generac Power Systems in Whitewater.[4] In the fall of 2021, Morgan enrolled at UW-Whitewater, where he was enrolled in Chemistry II and maintaining a 3.5 GPA. In June, 2022, after his father died, Morgan moved to an apartment in Whitewater. Morgan was laid off by Generac in December 2022.

---

[3] There is no substitute for actually looking at all of the images in the affidavit.

[4] Janesville is about 20 miles southwest of Whitewater, and about 10 miles west of the county line separating Wisconsin's two federal judicial districts.

Morgan continued to live in his Whitewater apartment until the summer of 2023, when he moved into in a travel trailer that he pulled behind his 23-year old pickup truck. Morgan was renting a storage locker at self-storage lot in Whitewater. By this time, the FBI in Milwaukee had been investigating Morgan long enough to have sought and obtained (on July 7, 2023) a search warrant from the Eastern District of Wisconsin aimed at Morgan's media accounts with Google and Gab.com.[5]  At the time of the warrant application, Morgan was working at a fast-food restaurant in Janesville.

**(C) Facts Relevant to the "Domestic Terrorism" Determination**

To aid the analysis of Morgan's suppression motion, I have rearranged the relevant facts in chronological order, set forth in three different typefaces depending on their nature.  Agent Mosiman's averments regarding Morgan's weaponry are presented in plain text.   Agent Mosiman's averments regarding Morgan's statements that could be construed as bespeaking violence are presented in bolded text.  Finally, I have added in italicized font all of the facts that Morgan claims are material omissions from Agent Mosiman's affidavit, along with the context of some of the documents from which Morgan has harvested them.[6]  I will cite to the affidavit portion of dkt. 23-1 as "Aff." followed by the affidavit's internal paragraph number:

---

[5] An incident summary in the FBI's eGuardian system–which Morgan has asked the court to consider in its analysis–indicates that the FBI's "Counterterrorism" review of Morgan's "suspicious activity" was converted to a full investigation on July 22, 2022. *See* dkt. 23-8.at 46. The  "Authorized Purpose" of this review and subsequent investigation was "To determine if identified subject is a threat to national security and/or is producing chemical weapons for use in a crime of violation [*sic*] or production that is in violation of federal law." *Id.* at 38.

[6] *See United States v. Hancock* 844 F.3d 702, 708 (7th Cir. 2016)(court's consideration of the omitted evidence can obviate the need for a *Franks* hearing).

July 15, 2019: Morgan goes online to buy two 950 mL (one quart) bottles of 98% sulfuric acid.  Aff.¶27.

August 9, 2019: Morgan posts a video on Facebook titled "Blome Waffenkreationen– BWk,"[7] which translates from German as "Weapon Creations."  The video shows how to mix and ignite sulfur dioxide/trioxide smoke powder to make a smoke cloud. Stepping into the cloud, Morgan states "huge smoke cloud of a choking agent" and "looks like I'm on the road to success then after all."  Morgan provides clarifying instructions for constructing the device. Aff. ¶14.

August 28, 2019: Morgan records a video he titles "acidthrowerinfomercial" in which he states that he is creating an acid sprayer in response to being threatened by Antifa.  The video shows Morgan demonstrating how use the acid sprayer and its burning effects on clothing. Morgan states "chemically burn commies alive and melt their faces off for ten dollars!" and "message me on Facebook to take advantage of this amazing deal."  Aff. ¶28.

August 30, 2019: Morgan posts a video on YouTube titled "BWk--Sulfur-X-Oxide Grenade Prototype Test."  He demonstrates the use of the homemade choking agent and reports "production to begin when I have funds." Aff. ¶15.

August 31, 2019: Morgan posts a YouTube video which he titles "Bwk-XW-M2 Saurewerfer" (German for "acid thrower").  Morgan displays multiple pre-assembled acid throwers and demonstrates how to use them to spray sulfuric acid.  Morgan shows how the acid damages concrete and burns through clothing.   He offers the acid throwers for sale at $10, acid not included. Aff. ¶29.

*[September 2, 2019: after receiving a tip about Morgan's anti-government videos. Officer Ben Fuhrmann of the Janesville Police Department reviews Morgan's videos and writes a*

---

[7] Recall that Morgan did not change his name from Blome until December 2022.

10

*report. In his summary, Officer Fuhrmann states "At this time, there are no criminal violations and is intelligence only [sic]." Dkt. 23-6 at 1. In the body of the report, Officer Fuhrmann reports:*

> *Although [Morgan] has strong political views, he does not make specific threats. In general, most of his posts are non-violent in nature. . . .*
>
> *. . he is wearing an armor plate carrier in one photo. I have not seen firearms. He has some knives that appear to be collectible old military knives.*
>
> * * *
>
> *I have not seen any posts with an actual Flame thrower. He posts videos of himself spraying Axe Body Spray on a lighter causing a bigger flame.*
>
> * * *
>
> *Overall, [Morgan] has strong political views but does not make any threats and the majority of his posts are non-violent in nature. He posts daily and is very vocal about the 2nd amendment but has not posted pictures of any firearms. He has access to knives and some old military memorabilia. His "chemical weapons" are simplistic and can be obtained at various locations open to the public. He does not have an actual flamethrower. He burns various materials but is not constructing explosives.*
>
> *Dkt. 23-6 at 5-6. ]*

**September 2019: an unnamed family member[8] reports that**

> **Morgan was extremely racist and prejudicial toward all people of color, creeds and ethnicities that are not [his] own. . . . Morgan had an extreme disdain for law enforcement, all forms of government, and all perceived authority. Since childhood, Morgan had difficulties with physical and verbal altercations due to extreme anger management issues. Later, in October 2019, the family member provided an additional general concern that Morgan's anti-government behavior and rhetoric was accelerating after Morgan moved to Janesville with his father.**
>
> **Aff. ¶8.**

---

[8] Morgan reports that this person was his mother, Christina Horne, who later provides a more benign assessment that Agent Mosiman did not include in his affidavit. Dkt. 23 at 6-7. I have included Horne's second assessment in temporal sequence below.

October 6, 2019: Morgan posts to Facebook:

> Everyone . . . I'm forming my own militia.  We'll be called . . .
> The New American Minutemen.  We stand for freedom.  Plain
> and Simple.  We are decentralized.  I created it, but it does to
> belong to me. . . . America has been losing their God given
> freedoms one by one.  I intend to defend these.  I am enraged.
> Our government taxes us endlessly, forces us to send our
> children to schools they control, control the press with their
> laws, and they've established over 700 imperialistic bases
> overseas and expect us to pay for them . . . .  Seems like we need
> to dust off our guns and do this again, my fellow Americans.
> And if anything happens to me because I said this . . . well that
> should just prove our basic rights no longer exist.  Who will
> answer this call to arms?  Who's with me?

> Aff. ¶16.

*[On or about November 13, 2019: the FBI interviews Morgan's father, Gregory Raines.
Morgan had started living with Raines in Janesville in August 2019.  Raines states that
Morgan suffers from acute alcoholism: despite attending AA daily, he often slipped up and
"rants on" with his "anti-government bullshit."  Raines does not believe that Morgan posed
an actual threat to anybody.  When Raines saw Morgan's video of his acid weapon, he told
Morgan it was not a good idea to post videos like that; Morgan responded that he was short
on money and only posted the video to advertise that he had some to sell.  Dkt. 23-4.]*

November 28, 2019: Morgan posts on Facebook about an encounter with law
enforcement regarding "weapons I invented."  Morgan stated

I was a chemistry major in college . . . .  I know what I'm doing.

Any gun I do ever have will be undocumented.

Like I even really need a convental weapon?  I'm a weapon designer, mf!  I can
invent something better anyway.

Aff. ¶19.

November 29, 2019: Morgan posts a Facebook video about how to create and use a device to spray sulfuric acid.  Morgan reports that this was part of the reason "the government came to my house."  Morgan continues: "People should not be afraid of their government, governments should be afraid of their people.  So here's how you make a device that shoots sulfuric acid." Aff. ¶30.

**November 2019: an anonymous tipster contacts the FBI to report that they were a Facebook friend of Morgan's.  Morgan had posted a video showing how to produce an acid gun, saying "governments should be afraid of their people.  So here's how you make a device that shoots sulfuric acid!" Aff. ¶17.**

> *[November 2019: one of Morgan's Facebook friends asks Morgan why he needed a full-armor suit; Morgan responded that he only had weapons and armor for his protection and that he believes that eventually the population will engage in war with police.  This friend asked Morgan this because, after reading Morgan's recent Facebook posts, he became concerned that Morgan's mental health issues had degraded and his anti-government and anti-law enforcement sentiments had accelerated.  The friend was particularly concerned that Morgan recently posted a picture of himself holding a new rifle, and that Morgan's comments indicated that he was preparing for a confrontation with the government or law enforcement.  Dkt. 23-3.]*

December 4, 2019: Morgan posts a video on YouTube titled "How to make a gun that shoots sulfuric acid" in which he again shows how to make and fire the device, as well as the damage it can cause.  Morgan calls his device the "XWM2 Acid Thrower" and "Experimentalwaffe Modell Zwei Saurewerfer" (German for "Experimental Weapon Model Two Acid Throwers." Aff. ¶31.

13

*[eGuardian "incident summary" regarding Morgan titled "Weapons of Mass Destruction."*
*Closed on December 11, 2019: "At this time, adequate predication does not exist to justify*
*opening a predicated investigation." "Threat to Life: No." Dkt. 23-8 at1, 15]*

**January 19, 2020: Morgan posts on Facebook: "I'm a loose cannon when I speak and
I really don't have that much space between thought and action.  Consequences often don't
even register in my mind when I get heated, I just act." Aff. ¶34.**

**February and March 2020: the same anonymous tipster reports that Morgan was
sending private Facebook messages stating that he dislikes the police and is claiming that he
will be going after law enforcement and the government. Aff. ¶35.[9]**

*[March 10, 2020 Alert posted to the Wisconsin Crime Alert Network about Morgan:*

> *Officer Safety Update*
>
> *Janesville Police Department has obtained updated information regarding*
> *suspected anti-government/anti-authority extremist [James Morgan]:*
>
> *Janesville resident [Morgan] . . . may use weapons in his possession to*
> *injure or assault law enforcement or other responding personnel if he feels*
> *threatened.  As of early 2020, [Morgan] continues to manufacture sulfuric*
> *acid throwers, to possess home-made sulfur-oxide "grenades," and now*
> *possesses multiple firearms, according to an identified social medial account*
> *associated with [Morgan]. [Morgan], a self-described individualist*
> *anarchist, indicated that he carries a loaded weapon to respond against any*
> *perceived threats to him.  At this time we do not assess that [Morgan]*
> *presents an imminent, specific threat, but we are concerned about an*
> *increased risk of injury, mishap, or unintended escalation in a potential*
> *encounter between [Morgan] and law enforcement or other first responders.*
>
> *Dkt. 23-7 at 1.]*

March 16, 2020: Morgan records a video describing using a glass syringe to create an acid
sprayer that is breech loaded, *i.e.,* that can be refilled and fired many times quickly. Aff. ¶32.

---

[9] As part of his request for a *Franks* hearing, Morgan claims that Agent Mosiman left out a
material portion of the tipster's report, which I set forth below in Section II.

March 20, 2020: Morgan records a video displaying the chemicals calcium hypochlorite and hydrochloric acid, which are for making "a lot of chlorine very quickly."  Agent Mosiman notes that "Chorine [*sic*] gas is a pulmonary irritant and was first used as a chemical weapon during World War I by the Germans in 1915." Aff. ¶¶20-21.

March 20, 2020: Morgan records a video showing the supplies needed to create homemade destructive devices, stating "for making things that go boom." [The affidavit shows a picture of two one-pound jars of commercially available Pyrodex, a smokeless black powder equivalent]. Aff. ¶ 36.

April 15, 2020: Morgan purchases from an online firearms dealer a Zastava Arms 7.62x39mm caliber AK-47, which Morgan has shipped to a firearms dealer in Janesville. Aff.¶ 37.

April 15, 2020: beginning with his purchase of the AK-47 and continuing through July 2, 2022, Morgan purchases multiple firearms at a total cost of $2813, and he buys $1250 worth of ammunition and firearm accessories. Aff. ¶44.

> [eGuardian "incident summary" regarding Morgan titled "Weapons of Mass Destruction." Closed on May 13, 2020. "Disposition: TFO Pertzborn has conducted a through review of material posted online by subject and determined that the material is not a violation of federal or state law.  TFO Pertzborn has communicated with Janesville Police mental Health Officer Erin Johnson concerning [Morgan's online postings. This assessment does not warrant further investigation at this time." "Threat to Life: No." Dkt. 23-8 at 16, 38]

Jan. 21, 2021: Morgan creates an account with Gab.com ("Gab").[10]  In his profile, Morgan states that he is in a relationship with @Wisteria_Frost (display name Violette Wisteria).  Aff. ¶52.

February 18, 2021: Morgan posts on Gab:

> Hello folks.  I noticed that the civilian arsenal is lacking in artillery due primarily to its cost and I want to fix this.  So I'm starting a company whose mission is to make artillery affordable to the common man. . . .  The law is a little funny with artillery.  Artillery cannot used "fixed cartridges" and artillery shells are "destructive devices."  Solely to get around this and for no other reason, my artillery pieces will use paper cartridges. . . . I am looking for investors.  If affordable artillery is something you'd like to see, let's talk.

> Aff. ¶46.

September 19, 2021: Morgan posts a video on Instagram explaining his plan to build, mass produce and sell 7.62 cm. (3") cannons, using a large pipe, threaded breach plug and ball projectiles.  Morgan never registered any such destructive devices under the NFA. Aff. ¶47.

**September 19, 2021: in the video referenced in the preceding paragraph, Morgan states that he was planning to mass produce them for about $100 to $1500 each, making "artillery available to the common man" and "yes, I do intend to finish this project.  Aff. ¶47.**

October 16, 2021: Morgan takes a photo of bottles of the chemicals calcium hypochlorite and hydrochloric acid, along with other chemicals used to make destructive devices and chemical weapons. Aff. ¶22.

---

[10] On its homepage, Gab.com describes itself as "The Free Speech Social Network and Pioneer of the Parallel Economy."

April 19, 2022: Morgan takes a picture of the supplies necessary to make destructive devices: Pyrodex, nails, coins, cylindrical cardboard tubes, hobby fuse and glue.  Aff. ¶38.[11]

May 12, 2022: Morgan posts on YouTube a video titled "Finishing up my Flamethrower."  He shows the components and design to create a gasoline flamethrower, and actually demonstrates his own working flamethrower.  Aff. ¶48.

May 18, 2022: Morgan posts a video with a location in Janesville showing firearms and ammunition, including two bolt action rifles, a semi-automatic rifle, a .44 caliber revolver, 7.5mm x 55mm ammunition, and multiple high-capacity drum ammunition magazines.  Aff. ¶39.

June 10, 2022: Morgan purchases from an online firearms dealer a PTR-91 A3S .308 rifle which Morgan has shipped to a firearms dealer in Janesville. Aff. ¶40.

June 18, 2022: Morgan posts on Instagram a photograph of himself brandishing his PTR-91 rifle, along with this statement:

> My new PTR 91.  It's a high quality HK G3 battle rifle clone.
> Semi auto.  Shoots .308 Winchester.  Box mag holds 20 rounds,
> also accepts 50 & 100 round drums (which is my plan).  Comes
> with that flash suppressor on the muzzle.  Aperture rear sight, ring
> & post front sight.  Bipod and optics are also planned.
>
> Aff. ¶41.

June 29, 2022: Morgan posts on Instagram a photograph of his PTR-91 rifle, two high-capacity drum magazines, and two ammunition boxes.  Aff. ¶42.

---

[11] Compare this photograph with the photograph of one of the completed shrapnel grenades seized from Morgan's safe and charged against him in this prosecution, dkt. 1 at 6.  Obviously, the results of the search are irrelevant to the court's review of the warrant.

July 1, 2022: Morgan posts another photograph on Instagram of his PTR-91 rifle, a .44 revolver and firearm ammunition.  Aff. ¶43.

July 8, 2022: Morgan visits webpages that offer for sale calcium hypochlorite and hydrochloric acid. Aff. ¶23.

*[eGuardian system report: "Counter terrorism" incident report converted to a full FBI investigation on July 22, 2022. Id. at 46. "Authorized Purpose: To determine if identified subject is a threat to national security and/or is producing chemical weapons for use in a crime of violation [sic] or production that is in violation of federal law. Threat to Life: No." Dkt. 23-8 at 38.*

July 28, 2022: Morgan takes a photo of chemistry equipment that was assembled on a table in his apartment. Aff. ¶24.

August 26, 2022: Morgan posts a YouTube workout video.  In the background of what appears to be Morgan's apartment, Morgan's flamethrower is visible. Aff. ¶49.

October 6, 2022: Morgan posts a cooking video in which a book titled "Anarchist Cookbook" can be seen on the table.  This book contains various instructions on how to create and manufacture improvised weapons and explosives.  Aff. ¶45.

January 12, 2023: the FBI Scientific Response and Analysis Unit analyzed Morgan's acid thrower weapon videos. It concluded that the videos were consisted with the use of concentrated sulfuric acid, which can cause disfiguring skin injuries and blindness. Aff. ¶33.

*[April 2023 interview: Morgan's mother tells Agent Mosiman that Morgan has been doing much better emotionally since his father and step-father passed away and has less aggressive behavior.  Morgan still held his anti-authority and misogynistic views but does not voice them and no longer has social medial accounts.  Horne does not have any concerns of Morgan's aggression and feels that his rhetoric had dramatically declined.  Dkt. 23-2.]*

18

*[On or about May 9, 2023, the FBI interviews management and employees at Generac, where Morgan had worked.[12]   Morgan was a difficult employee to manage who was disciplined for violations including absenteeism, failure to follow safety rules, insubordination, poor attitude, and having a gun in his vehicle on Generac property.  When questioned about the gun, Morgan  was very nervous, and on the verge of tears, and state he would never bring the gun into work.  The manager deemed him "harmless."]*

May, 2023: A co-worker of Morgan's at Generac states that Morgan said that he learned how to make bombs at school.  Another co-worker states that they were concerned that Morgan would be "the first person to go postal." Aff. ¶50.[13]

May 10, 2023: Morgan sends direct messages to Gab user @wisteria_frost regarding the use of chlorine gas against government agents:

Morgan:     Or if it's goobermint coming for the guns . . . I have a different plan entirely.  We'll defeat them without firing a single shot.

Wisteria:    Yeah, the 9mm or shot, got it, hun.  Of course, darling.

Morgan:     If it's goobermint coming for the guns . . .throws you a gas mask, get it on NOW! –reacts calcium hypochlorite with hydrochloric acid, producing a huge amount of chlorine in the confined space of the apartment– ... now watch.  Goobermint like a bunch of retards is gonna do their fave strategy where 20 guys charge in all at once.

Wisteria:    Of course, I'll follow your plan if we have to deal with them, darling.

Morgan:     Do you like that plan?

---

[12] As noted above, Morgan was laid off by Generac in December 2022, so this information would have been historical.

[13] This employee likely was interviewed at the time the FBI visited Generac and talked to management.  "Go postal" is defined as "to become very angry and do something violent." Https://dictionary.cambridge.org>dictionary>go-postal.

Wisteria:     Yes, I love your plan. You're awesome when it comes to
              planning stuff.

Morgan:       Then once they haven't heard from or seen their strike team for
              a good minute, they're gonna be really scared. Lol.

              Aff. ¶26.

May 14, 2023: Morgan posts on Gab to @wisteria_frost, commenting on a Reddit post showing a white teacher being asked to show respect by kissing a black student's hand: "put that nigger on a tree." Aff. ¶52.a.

May 21, 2023: Morgan posts on Gab to @wisteria_frost, "I think it's about time we Americans had a heart to heart talk about our jewish problem." Aff. ¶52.b.

May 29, 2023: Morgan posts on Gab to @wisteria_frost,"I think US law should only protect US citizens. If you kill an illegal, I think literally nothing should happen to you." Aff. ¶52.c.

Spring 2023: a maintenance employee at Morgan's apartment building reported that he saw chemistry equipment set up in Morgan's bedroom. Aff. ¶26.

July 7, 2023: The government seeks and obtains from Magistrate Judge Nancy Joseph in the Eastern District search warrants directed at Google LLC and Gab.com to obtain Morgan's direct message content, photos and videos. Aff. ¶13.

July 7, 2023: the FBI's execution of its search warrant for Morgan's Google account reveals an 80-page Adobe Acrobat document entitled "Home Expedient Firearms–9mmSMG.pdf," a digital book of instructions on how to make a homemade submachine gun. Aff. ¶54.

**November 22, 2023: Morgan posts on Gab.com:**

**I may be accused of fedposting,[14] but actually I'm not telling anyone to do anything, I'm just making an observation: the one thing above all other things they nail into your head over and over from the youngest age is "violence is not the answer." You know what? It literally is an answer. You know how I know that? Because while they teach you that, they use violence themselves to solve their problems. That's the observation.**

**Aff. ¶52.d.**

December 7, 2023: @wisteria_frost posts : "All cops can die. I fucking hate cops as much

as I hate niggers. The only good cop is a dead cop."

## ANALYSIS

### I. Standard of Review

Morgan's motion to suppress is based on a claim of improper venue. Morgan does not contend that Agent Mosiman's affidavit lacks probable cause that Morgan committed some federal offense, nor does he contend that the factual omissions he has flagged would negate probable cause to search his property. Morgan claims that he is entitled to suppression because the homemade shrapnel grenades charged against him in this case were found and seized in the *Western* District of Wisconsin pursuant to the execution of a Rule 41(b)(3) search warrant improperly issued by Magistrate Judge Dries in the *Eastern* District of Wisconsin. This, argues Morgan, was an error of constitutional dimension that requires application of the Exclusionary Rule.

---

[14] "Fedposting" means to post violent threats on the internet ostensibly as an everyday citizen, but actually working as an undercover federal agent as a form of entrapment. *See* en.wiktionary.org/wiki/fedpost.

As a baseline, F.R. Crim. Pro. 41(b)(1) provides that a magistrate judge has authority to issue a search warrant for property located within the district in which that judge has authority. Rule 41(b)(3) then provides that, in an investigation of domestic terrorism, a magistrate judge "in any district in which activities related to that terrorism may have occurred has authority to issue a warrant for a person or property within or outside that district." Agent Mosiman invoked Rule 41(b)(3) in his application, and Judge Dries issued the requested warrant, concluding that Agent Mosiman has sufficiently established that he was investigating domestic terrorism.

Morgan contends that this was incorrect because the facts presented to Judge Dries did not meet the threshold required by Rule 41(b)(3). In requesting a *Franks* hearing, Morgan contended that Agent Mosiman intentionally or recklessly omitted information from his affidavit that would have made clear to Judge Dries that this was not a qualifying domestic terrorism investigation.

To establish that Rule 41(b)(3) does not apply to the FBI's warrant application, Morgan must establish that Agent Mosiman failed to meet a burden of persuasion *lower* than probable cause.[15]  As the court found in *Matter of One Apple iPhone Smart Phone*, 628 F.Supp.3d 155 (D.D.C. 2022), to establish venue for an extraterritorial search under Rule 41(b),

> The government must proffer sufficient facts to establish a "reason to believe" both that there is (1) "an investigation of domestic terrorism or international terrorism" and (2) that the Court is in a district "in which activities related to the terrorism may have occurred." . . . [T]he text of Rule 41(b)(3) suggests that the government need not carry a heavy burden in meeting these two requirements.

---

[15] Which is, itself, a very low hurdle to clear: "Probable cause is far short of certainty–it requires quires a substantial chance of criminal activity, not an actual showing of such activity, and not a probability that exceeds 50 percent either." *United States v. Reichling*, 781 F.3d 883, 887 (7th Cir. 2015).

*One Apple iPhone*, 628 F.Supp.3d at 161-62.[16]

In reaching this conclusion, the court relied on *United States v. Thorne*, 548 F.Supp.3d 70 (D.D.C. 2021), which held that Rule 41(b)(2) should not be read to require probable cause as to the whereabouts of the target person or property:

> [T]he venue requirement is an extra-constitutional requirement for warrants, and therefore falls outside the strictures of the Warrant Clause, as indicated by the Fourth Amendment's silence on the topic of venue. Construing Rule 41(b) to integrate a "reason to believe" standard aligns with the Supreme Court's consistent conclusion that, in contexts not directly governed by the warranty requirement, "the ultimate touchstone of the Fourth Amendment is reasonableness." *Riley v. California,* 573 U.S. 373, 381 (2014).
>
> * * *
>
> The "reason to believe" or "reasonable belief" standard is satisfied by something less than would be required for a finding of probable cause. It is an objective standard that requires "more than a hunch, but less a probability."

*Thorne*, 548 F.Supp.3d at 127, citations omitted.

"Reason to believe" is "not a particularly high standard" but it does require "specific and articulable facts, that, taken together with rational inferences drawn therefrom, provide a particularized and objective basis for thinking that the venue provision is satisfied." *Id.*, *citing United States v. Thomas*, 429 F.3d 282, 289 (D.C. Cir. 2005) and *United States v. Bohannon*, 824 F.3d 242, 255 (2nd Cir. 2016)(equating "reason to believe" with reasonable suspicion, and noting that both standards are "fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed"). In this circuit, "reasonable suspicion demands only a minimal level of objective justification." *United States v. Olson*, 41 F.4th 792, 800 (7th Cir. 2022). "Officers may lean upon their experience and specialized

---

[16] Magistrate Judge Faruqui's opinion is not binding on this court, but I agree with his reasoning and conclusion.

training to draw inferences from and deductions about available cumulative information." *Id.* Behavior that may seem innocent under some circumstances may amount to reasonable suspicion when viewed in the context at play when law enforcement acts.  *Id.* at 801.

## II. Morgan's Request for a Franks Hearing

In his motion, Morgan claims that Agent Mosiman recklessly or intentionally omitted from his affidavit material facts that would have caused Judge Dries to reject the government's request to allow it to search for Morgan and his property in the Western District of Wisconsin. I have set forth all of this additional information in italics in Section I(C) of the Facts, above.

In *United States v. Woodfork*, 999 F.3d 511 (7th Cir. 2021), the court provided this gloss of the law governing *Franks* hearings:

> The ability of the neutral and detached magistrate to determine probable cause depends on the accuracy of the information the police submit.  A search warrant is not valid if the police obtain it by deliberately or recklessly presenting false material information, or by omitting material information from the affidavit provided to the issuing judge.
>
> To obtain a *Franks* hearing, the defendant must make a substantial preliminary showing of (1) a material falsity or omission that would alter the probable cause determination, and (2) a deliberate or reckless disregard for the truth. . . . *Franks* hearings are rarely held because these elements are hard to prove.
>
> *Id*. at 516, citations and internal quotations omitted.

The court continued:

> Even if Woodfork was able to establish that Crawley made some material omission during the probable cause hearing, Woodfork has failed to make the necessary substantial preliminary showing that Crawley intentionally or recklessly misled the warrant-issuing judge.  To secure a *Franks* hearing, a defendant must put forth an

24

offer of proof that is more than conclusory and gestures toward more than negligent mistakes. What is needed is direct evidence of the affiant's state of mind or else circumstantial evidence of a subjective intent to deceive. To make the necessary preliminary showing, the evidence must show that the officer submitting the complaint perjured himself or acted recklessly because he seriously doubted or had obvious reason to doubt the truth of the allegations.

*Id.* at 517-18, citations and internal quotations omitted.

At a February 21, 2024 telephonic hearing, I denied Morgan's request for a *Franks* hearing, finding that Morgan had not made a substantial preliminary showing that Agent Mosiman had acted intentionally or recklessly by omitting Morgan's proffered information from his affidavit. *See* February 21, 2024 text-only order, dkt. 27. I observed that Agent Mosiman would have no motive to mislead Judge Dries on this point because Mosiman easily could have presented the identical warrant application to this court–and to this judicial officer–rather than mislead Judge Dries into incorrectly issuing a multi-district domestic terrorism warrant.

Morgan argues that this court's reason for denying him a hearing constitutes improper speculation, contrary to what was deemed appropriate in *United States v. Glover*, 755 F.3d 811, 820-21 (7th Cir. 2014). There, the court held that if the defendant makes a substantial preliminary showing of intentional or reckless omissions from an affidavit, then the defendant need not disprove innocent explanations for the omissions before the *Franks* hearing itself. *Id.* But Morgan hasn't *made* a substantial preliminary showing that Agent Mosiman intentionally or recklessly omitted the flagged information for the purpose of inveigling Judge Dries into issuing an otherwise unjustified extraterritorial search warrant. Morgan's contention essentially amounts to bootstrapping, using a faulty syllogism: Morgan has deemed certain specified facts material to the Court's Rule 41(b)(3) analysis; Agent Mosiman did not include these facts in

25

his affidavit; therefore Agent Mosiman intentionally or recklessly misled the warrant-issuing judge. This does not constitute direct evidence of Agent Mosiman's state of mind or circumstantial evidence of his subjective intent to deceive. *See, e.g., United States v. Woodfork*, 999 F.3d 511, 518 (labeling affiant's omission of information "deceptive" does not make it so).[17] The omission of the facts flagged by Morgan do not show that Agent Mosiman seriously doubted or had obvious reason to doubt that the his investigation of Morgan qualified for an extraterritorial warrant domestic terrorism warrant under rule 41(b)(3). That's because an objective consideration of these omitted facts, in context, does not support Morgan's contention that these omissions actually impeach Agent Mosiman's averment, based on his training and experience in terrorism investigations, that this was a qualifying domestic terrorism investigation.

This point is intertwined with, and segues to a second reason why Morgan is not entitled to a *Franks* hearing: none of the omissions cited by Morgan were material to Judge Dries's determination to issue a Rule 41(b)(3) warrant. Government-suppressed evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *United States v. Clark*, 935 F.3d 558, 567 (7th Cir. 2019) (citations and quotations omitted). As discussed in the "reason-to-believe" section that follows, the evidence presented to Judge Dries met the government's burden of establishing that a domestic terrorism investigation was warranted here. This is true even when the all of the

---

[17] In a May 31, 2024 unpublished (nonprecedential) opinion, the court of appeals upheld the denial of a *Franks* hearing, stating "One final point warrants underscoring. Even if we assume that the warrant affidavits contained material omissions, Hampton's contentions would still fail because he comes nowhere close to showing, as he must under *Franks*, that Officer McGill intentionally or recklessly excluded information from his affidavits. *See* 438 U.S. at 155-56. Hampton does no more than speculate that the omissions must have been intentional. Our case law is clear that conclusory allegations doe not suffice, however. *Woodfork*, 999 F.3d at 518." *United States v. Hampton,* Case No. 23-1505, slip op. At 4 (7th Cir., May 31, 2024).

omitted evidence is added to the reason-to-believe mix.  *See United States v. Hancock* 844 F.3d at 708.

### III. Reason To Believe That This Investigation Involved Domestic Terrorism

F.R. Crim. Pro. 41(a)(2)(D) provides that 18 U.S.C. § 2331 supplies the definition of "domestic terrorism," which is not a stand-alone crime.  Section 2331(5) states that

(5) The term "domestic terrorism" means activities that—

(A) involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State;

(B) appear to be intended

(I) to intimidate or coerce a civilian population;

(ii) to influence the police or a government by intimidation or coercion; or

(iii) to affect the conduct of a government by mass destruction, assassination, or kidnaping; and

(C) occur primarily within the territorial jurisdiction of the United States.

F.R. Crim. Pro 41(b)(3) states that

(3) a magistrate judge–in an investigation of domestic terrorism or international terrorism–with authority in any district in which activities related to the terrorism may have occurred has authority to issue a warrant for a person or property within or outside that district.

So, when a defendant challenges the issuance of an extraterritorial warrant under Rule 41(b)(3), the court must determine (1) whether the government had opened a domestic terrorism investigation of Morgan and (2) whether the evidence presented in Agent Mosiman's affidavit–as supplemented by the evidence proffered by Morgan in his *Franks* request-provide

27

"reason to believe" that Morgan's activities fall within the statute's definition of "domestic terrorism." *See One Apple iPhone*, 628 F.Supp. 3d at 163.

Morgan does not dispute that the FBI had opened a domestic terrorism investigation of him: the final eGuardian report that he proffered shows that the FBI opened its investigation on July 22, 2022. Nor does Morgan dispute that Agent Mosiman's affidavit adequately establishes requirements (5)(A) and (5)(C) of § 2331(5). His motion hinges on his contention that the evidence did not provide reason to believe that his dangerous acts appeared to be intended to violate any of requirement (5)(B)'s three subsections.

Morgan methodically presents his various arguments in support of his position, in which he makes two main points: first, that there is no nexus between his alarming rhetoric and his activities that could be dangerous to human life. *See, e.g.,* Reply, dkt. 40, at 5 and 9. Second, the evidence omitted by Agent Mosiman establishes that law enforcement never viewed Morgan as an imminent threat, which undercuts any argument that his words and deeds meet Requirement (5)(B) of the domestic terrorism definition *see id.* at 14-16.

Morgan's claim of an explicit "nexus" requirement is unfounded. Morgan asserts that "for obvious First Amendment reasons, proof of a dangerous crime coupled with proof of the suspect's biases doesn't mean that the FBI has a terrorism investigation on its hands, absent at least *some* connection between the two." Dkt. 40 at 5, emphasis in original. It's not clear what Morgan is contending. It is true that his disdain for Blacks, Jews and undocumented immigrants–Morgan's "unvarnished bigotry" in his attorney's words, dkt. 23 at 15–is not, by itself, actionable. But unvarnished bigotry accompanied by veiled suggestions of violence against members of those groups, in conjunction with years of designing, building and accumulating

legal and illegal weaponry is a legitimate area of law enforcement concern, regardless whether Morgan has explicitly connected the dots to the degree he asserts is required.

By analogy, in *United States v. Hasson*, 26 F.4th 610, 612 (4th Cir. 2022)–a case cited by Morgan–The defendant challenged the court's increase of his sentence in a simple unlawful firearm possession case (18 U.S.C. § 922(g)(3)) because the court impose the Sentencing Guideline's terrorism enhancement under USSG 3A1.4.  The sentencing court reasoned that

> defendant's rhetoric and weaponry separately would not justify applying the terrorism adjustment, but in combination they revealed  that he was actually in the process of formulating a plan that makes this a case where the terrorism enhancement applies.

> *Id.* at 626.

The enhancement was upheld on appeal. *Id.* at 627.  Hasson's rhetoric was more violent and more focused than what Morgan was posting, *see* 26 F.4th at 613-14, but it also bears noting that in order to prevail on its request for a terrorism enhancement, the government had to prove the enhancement's applicability by a preponderance of the evidence. *Id.* at 625.  In the instant case, Judge Dries only had to find "reason to believe" that activities "related to terrorism" "may have occurred" in the Eastern District of Wisconsin.  As Judge Faruqui found in *One Apple iPhone*, this is not a heavy burden for the government to carry. 628 F.Supp.3d at 62.  After all, as the court noted in *United States v. Abu Ali*, 528 F.3d 210,264 (4th Cir. 2008)–another case cited by Morgan–"we cannot wait until there are victims of terrorist attacks to fully enforce the nation's criminal laws against terrorism."[18]

---

[18] Like *Hasson, Abu Ali* involved a sentencing guideline dispute that involved more alarming facts than those present here.

This segues to a journal article repeatedly cited by Morgan in his brief: Brill, "What is Domestic Terrorism and Why Does the Definition Matter?" 71 DOJJFLP 7 (Aug. 2023). Glossing *One Apple iPhone*, Sophia Brill–who was at the time Senior Counsel to the Assistant Attorney General for national Security– stated that:

> The opinion supports a fairly commonsense understanding of Section 2331(5). Actions can constitute domestic terrorism if they involve dangerous and illegal conduct, appear intended to inflict fear on civilians or the government, and occur primarily in the United States. Notably, the analysis was not limited to considering the specific elements of the potential crimes at issue. That is, the government was not required to demonstrate that a charge for seditious conspiracy, obstruction of Congress, destruction of property, or any other allege offense necessary entails conduct dangerous to human life, or that such offenses are necessarily intended to further one of the purposes in section 2331(5)(B). Rather, the government satisfied the requirements of section 2331(5) by describing the conduct alleged by these specific subjects of the investigation.
>
> 71 DOJJFLP 7 at**15-16.

Brill also explained what Attorney General Garland meant when he said that the USDOJ "is focused on *violence*, not ideology" (emphasis in original), a quote on which Morgan relies. AG Garland was *not* saying that ideology is irrelevant in a terrorism investigation. AG Garland was explaining that "it is critical that we condemn and confront domestic terrorism regardless of the particular ideology that motivates individuals to violence." June 15, 2021 USDOJ Domestic Terrorism Policy Address, quoted in 71 DOJJFLP 7 at *22. As Brill explained,"federal prosecutors . . . must remain carefully neutral as to ideology when charactering conduct as domestic terrorism, whether for sentencing purpose or otherwise" so as to forestall "any perception that the government enforces its counter terrorism authorities differently based on ideology." *Id.*

30

So let's apply the test to the facts. Morgan argues that although his "activities were troubling and his words were disturbing," the government has not proved a relation to domestic terrorism or an intent to intimidate civilians, influence government policy, or affect government conduct. Dkt. 40 at 9. I agree that Agent Mosiman's affidavit does not prove such a relation by a preponderance of the evidence; and, if probable cause were the threshold, then this would be a wobbler at best. But all the FBI had to show Judge Dries was that it had "reason to believe" these things about Morgan. It has met this burden.

This is true even when the court considers all of the excluded information proffered by Morgan. At the time he sought his warrant, Agent Mosiman had a three-year, four-month time line of Morgan's words and deeds, from July 2019 to November 2023. Law enforcement's concern about Morgan's dangerousness ebbed and flowed over this period. Obviously, Morgan was on law enforcement's radar this entire time, as evidenced by the Janesville Police Department's September 2, 2019 report, the FBI's November 2019 interview with Morgan's father, the first eGuardian incident summary closed on December 11, 2019, the March 10, 2020 officer safety update, the second eGuardian incident summary closed on May 13, 2020, followed by the FBI's re-opening of its investigation in 2022, when the third eGuardian report evolved into a full-blown domestic terrorism investigation.

Morgan points to these closed law enforcement reports and their at-the-time conclusions as proof that he did not pose a danger to human life at the time Agent Mosiman applied for his search warrant. Morgan is incorrect. First, many of these reports were based on incomplete information regarding what Morgan was doing and saying at the time. Nobody gathered and collated all of the relevant information until the FBI opened its investigation in 2022. Second,

the time line shows that both Morgan's weapon accumulation and alarming rhetoric increased over the years, rendering the earlier law enforcement assessments out-of-date and essentially irrelevant.

For instance, it wasn't until after the second eGuardian report was closed in May 2020 that Morgan posted his plan to build and sell cannons, thereby "making artillery available to the common man" (September 2021); took a photograph of the bottles of chemicals used to make destructive devices and chemical weapons (October 2021); took a picture of the supplies necessary to make shrapnel grenades (April 2022); posted a video titled "Finishing up my Flamethrower" in which he demonstrated his own working flamethrower (May 2022); purchased his PTR-91 assault rifle with plans to purchase optics and a bipod[19] (June 2022); and posted on Instagram a photograph of his PTR-91 rifle, two high-capacity drum magazines, and two ammunition boxes (June 2022). Then, a year later, Morgan's May 2023 Gab posts rocketed Morgan's threat potential into the red zone.

Morgan now dismisses these posts as "private puffery to his girlfriend." Dkt. 40 at 7. This is self-serving and irrelevant in equal measure. It is self-serving because there is no evidence that Morgan's intent was to woo wisteria_frost by musing about massacring a team of government agents with poison gas, lynching Blacks, "addressing" America's "Jewish problem" and declaring open season on undocumented aliens.[20] It is irrelevant because (a) the FBI would have absolutely no way to know this; (b) even if the FBI suspected that this might be alt-right

---

[19] It's fair to ask: who has more use for optics and a bipod for their assault rifle, a man defending his apartment/trailer home, or a sniper on a rooftop?

[20] This is as good a place as any to note that Morgan's perceived need to "address" the "Jewish Problem" is all the more alarming given his *Deutsche Waffenindustrie* role-playing when designing and building exotic weaponry.

pillow talk, it would have been dereliction for the FBI to fail to investigate, and (c) Wisteria_Frost's encouragement (*e.g.,* "All cops can die. . . . the only good cop is a dead cop") may well have provided the push Morgan needed to impel him to act on his plans. Social media are awash with anecdotes of men doing stupid, dangerous things to impress their girlfriends. In short, these May 2023 posts, by themselves, obliterated all of the earlier reports and assessments that Morgan was not a threat to human life.

This includes the reports by Morgan's parents, his friend, and Generac management. In 2019, his father reported that, although Morgan suffered from acute alcoholism, often slipped up, and ranted on with anti-government bullshit, he wasn't a threat to anybody. Morgan's mother, on the other hand, contemporaneously reported that Morgan had extreme anger management issues that led to physical and verbal altercations, and that his anti-government behavior and rhetoric had accelerated after he moved in with his father. In April 2023, Morgan's mother changed her opinion, reporting that Morgan was doing much better emotionally since his father and stepfather had died. She felt that his aggression and rhetoric had dramatically declined. Yet, within the month, Morgan was posting his most graphically violent messages to date, all aimed at the groups he despised. Obviously, Mom was not on the same page as her son and Wisteria_Frost. To the same effect, the Generac reports, which dated back to events in 2022 or earlier, were based on what Generac's people knew and saw on their premises. Management may have viewed Morgan as harmless on site, but they would have had no reason to know about his acid-thrower, flamethrower, AK-47, PTR-91 or his bomb-building supplies.

So, by the time Agent Mosiman applied for his warrant, the FBI had ample reason to believe that Morgan had finally crossed the line into domestic terrorism. Included in the

equation was Morgan's November 22, 2023 Gab post "just making an observation" that "violence . . . literally is an answer."  Morgan points out that he specifically stated that "I'm not telling anyone to do anything."  This cuts in his favor, but it does not remove this post from the FBI's "reason to believe" analysis.  Rhetorical paralipsis is a time-honored method of raising a fraught topic while claiming that you're not.  In light of everything else Morgan has posted and advocated up to this point, Morgan's statement, taken in context, can fairly be characterized as paralipsis under the  reason-to-believe standard of proof.

To sum up, the FBI had gathered and considered four years of information evidencing that Morgan was an angry, impulsive, mentally ill alcoholic who collected legal but highly lethal assault rifles and drum magazines, and who delighted in designing and building antipersonnel weapons such as acid sprayers, flamethrowers, poison gas, illegal shrapnel grenades, and artillery. Morgan was unabashedly and vocally racist and anti-Semitic.  Periodic law enforcement investigations in the past had sufficiently allayed concerns about Morgan's imminent danger to forestall further action at the time the reports were written.  But starting in 2022, Morgan's weaponry got deadlier and his rhetoric became more targeted and more alarming.

These accumulated specific and articulable facts, taken together with rational inferences drawn therefrom by trained FBI antiterrorism agents, provided a particularized and objective basis to believe that Morgan was engaged in domestic terrorism by collecting and building dangerous and illegal weapons that now appeared to be intended to intimidate disfavored civilian groups and to intimidate–and to kill–law enforcement officers if they were to intervene. *United States v. Thorne*, 548 F.Supp.3d at 127; *see also United States v. Olson*, 41 F.4th 792, 800-01 (7th Cir. 2022).  Morgan's words and deeds, viewed as a whole and in the context of the four-year

34

investigation, provided the minimal level of objective justification necessary to invoke the extraterritorial venue provisions of Rule 41(b)(3). Therefore, I am recommending that the court deny Morgan's motion to suppress.

## IV. Good Faith

Notwithstanding Morgan's lengthy and strident arguments against the applicability of Rule 41(b)(3), this does not strike the court as a particularly close call. If, however, I am wrong and it was error for Judge Dries to allow extraterritorial execution of this warrant, then I still am recommending that the court deny Morgan's motion. The Fourth Amendment injury that Morgan is complaining about is that the FBI, armed with a search warrant, crossed the imaginary boundary line between the Eastern and Western Districts and drove about 10 miles into Rock County to search Morgan's trailer in Janesville. Morgan does not dispute that if the agents had found his trailer in Whitewater, then they could have searched it on this warrant. Morgan does not dispute that if the FBI had sought a warrant from this court to search his trailer in Janesville, then this court could have issued the warrant and the same search would have occurred.[21]

Morgan's beef is that a magistrate judge in the Eastern District had no authority to issue a Rule 41(b)(3) warrant that could be executed in the Western District, but was tricked into doing so by Agent Mosiman's "misconduct," "gross negligence" and "sloppy police work" when the agent presented an affidavit that omitted the information Morgan contends would have shown that the domestic terrorism exception does not apply to him. Dkt. 40 at 20. Accusations

---

[21] Morgan does not concede that this actually would have happened, since this would be conceding inevitable discovery. Dkt. 40 at 21. It's unlikely that this will end up mattering, but if the court wishes to pursue the inevitable discovery analysis further, it has the option of reopening the evidentiary record. *See* 28 U.S.C. § 636(b)(1)(C). It should be clear enough from this Report that if Agent Mosiman had presented his application in this court, I would have issued the requested warrant.

this strident have become routine in warrant challenges, as have requests for *Franks* hearings. More often than not, the court doesn't find the malfeasance that a defendant proclaims to be so blatant. So it is here. Having found that Agent Mosiman did not act recklessly or intentionally, the court may consider the government's backup good faith argument.

Suppression of evidence is not a Fourth Amendment right, nor a remedy for a Fourth Amendment violation. *United States v. Davis*, 44 F. 4th 685, 689 (7th Cir. 2022) (citing *Davis v. United States*, 564 U.S. 229, 236 (2011)). Courts employ the exclusionary rule to deter intentional conduct that was patently unconstitutional, wanton, and purposeful. *Id.* (citing *Herring v. United States*, 555 U.S. 135, 1343 (2009) and *Brown v. Illinois*, 422 U.S. 590, 602-03 (1975)). In *United States v. Kienast*, 907 F.3d 522 (7th Cir. 2018), then-Judge Barrett wrote:

> Suppression of evidence is a last resort. It is not a personal constitutional right, nor is it intended to remedy the injury of having one's rights violated. Instead, it is a judge-made rule meant to deter future Fourth Amendment violations. And its application has been strictly limited by the Supreme Court.
>
> The Court has instructed that the exclusionary rule be limited to cases in which its deterrent effect on police conduct will outweigh its heavy costs. Strong cases for exclusion involve deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights on the part of the police. In such cases, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But exclusion is not appropriate where the police act with an objectively reasonable good-faith belief that their conduct is lawful. In that type of case, the deterrence rationale loses much of its force, and exclusion cannot pay it way.

907 F.3d at 527, internal quotations and citations omitted.

This analysis holds even if the challenge warrant was void *ab initio*, as Morgan contends here. *Id.* at 528. It also applies to search warrants issued for property outside of a magistrate judge's jurisdiction. *United States v. Grisanti*, 943 F.3d 1044, 1050 (7th Cir. 2019).

As the court observed in *United States v. McGill*, 8 F.4th 617, 624 (7th Cir. 2021), the exclusionary rule "does not apply automatically.  Rather, it applies only when its deterrence benefits outweigh its substantial social costs, and certain exceptions to the rule have arisen accordingly."  One such exception is when the police act with an objectively reasonable good-faith belief that their conduct is lawful:  in this situation, "the deterrence rationale loses much of its force and the exclusionary rule does not apply." *Id.* (citations omitted).  Although it is the government's burden to demonstrate that Agent Mosiman was acting in objective good faith, his decision to obtain a warrant is prima facie evidence of his good faith.  Therefore, this court presumes that the FBI was acting in good faith, and it becomes Morgan's burden to rebut this presumption:

> The burden to show unreasonable reliance on a warrant is heavy by design.  A warrant is a judicial mandate to an officer to conduct a search that the officer has a sworn duty to carry out in a nearly ministerial fashion.  A magistrate or judge, moreover, is typically far more qualified than a police officer to decide whether probable cause exists, and so an officer cannot ordinarily be expected to question a judge's probable cause determination.  A magistrate's erroneous approval of a warrant certainly does not immunize an officer's subsequent search, but it is still no small feat to overcome the presumption of good faith.

*United States v. Matthews*, 12 F.4th 647, 653 (7th Cir. 2021).

In light of the analysis undertaken and conclusions reached earlier in this report, the question at this juncture is whether it was reasonable for Agent Mosiman to rely on the warrant issued by Judge Dries; in light of the analysis and conclusions reached earlier in this report, the answer to this question is "Yes."  As the government points out, Agent Mosiman's application and affidavit stated the nature of the investigation, cited rule 41(b)(3), and set forth the material facts. Judge Dries issued the warrant.  As already noted, this court has found that this was a

legally correct decision.  But if it was not, then it certainly was a close enough call that Agent Mosiman and his colleagues were justified in relying on the warrant when they found and searched Morgan's trailer in Janesville.  The good faith doctrine salvages this search even if it was error for Judge Dries to have issued a Rule 41(b)(3) warrant in this case.


RECOMMENDATION

Pursuant to 42 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend that this court:

(1) Deny defendant James Morgan's motion to dismiss the indictment (dkt. 22); and

(2) Deny defendant James Morgan's motion to suppress evidence (dkt. 23).


Entered this 5th day of June, 2024.

BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Madison, Wisconsin  53703

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

June 5, 2024

Meredith Duchemin
Assistant United States Attorney
222 West Washington Avenue, Ste. 700
Madison, WI 53703

Jonathan Greenberg
Federal Defender Services of Wisconsin
22 East Mifflin St., Ste. 1000
Madison, WI 53703

      Re:   United States v. James Morgan
            Case No. 24-cr-4-jdp

Dear Counsel:

      The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

      The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

      In accordance with the provisions set forth in the memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before June 19, 2024, by filing a memorandum with the court with a copy to opposing counsel.

      If no memorandum is received by June 19, 2024, the court will proceed to consider the magistrate judge's Report and Recommendation.

            Sincerely,

            /s/

            Courtney Lanz
            Assistant to Magistrate Judge Crocker

Enclosures

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

      (1) injunctive relief;

      (2) judgment on the pleadings;

      (3) summary judgment;

      (4) to dismiss or quash an indictment or information;

      (5) to suppress evidence in a criminal case;

      (6) to dismiss or to permit maintenance of a class action;

      (7) to dismiss for failure to state a claim upon which relief can be granted;

      (8) to dismiss actions involuntarily; and

      (9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation. Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth with particularity the bases for these objections. An objecting party shall serve and file a copy of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection. Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects. The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection. The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions. The district judge, in his or her discretion, may conduct a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals.** *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).